## NATIONAL PUBLISHING COMPANY, INC. *v.*
## HARTFORD FIRE INSURANCE COMPANY
## (SC 17647)

Norcott, Katz, Palmer, Zarella and Schaller, Js.

Argued September 18, 2007—officially released July 8, 2008

*James V. Somers*, with whom was *Regen O'Malley* and, on the brief, *John B. Farley, John C. Pitblado* and *Daniel P. Scapellati*, for the appellant (defendant).

*Steven D. Ecker*, with whom was *Peter M. Haberlandt*, for the appellee (plaintiff).

*Opinion*

SCHALLER, J. The sole issue in this certified appeal is whether the trial court properly refused to charge the jury on the defendant's special defense of late notice in this action for breach of an insurance contract. The defendant, Hartford Fire Insurance Company (Hartford), appeals, following our grant of certification,[1] from

---

[1] We granted Hartford's petition for certification limited to the following question: "Did the Appellate Court properly affirm the trial court's refusal to charge the jury on [Hartford's] late notice of special defense?" *National Publishing Co.* v. *Hartford Fire Ins. Co.*, 278 Conn. 903, 896 A.2d 105 (2006). Because the certified question contains a typographical error, we rephrase

the judgment of the Appellate Court, which affirmed the judgment of the trial court rendered in accordance with a jury verdict in favor of the plaintiff, National Publishing Company, Inc. (National). See *National Publishing Co.* v. *Hartford Fire Ins. Co.*, 94 Conn. App. 234, 236–37, 892 A.2d 261 (2006). Hartford claims that the trial court's refusal to charge the jury on its special defense of late notice was harmful error because the timeliness and adequacy of National's notice, as well as the question of whether Hartford was prejudiced by any delay in notice, presented disputed issues of fact for the jury to resolve.[2] We reverse the judgment of the Appellate Court.

The jury reasonably could have found the following facts. At all times relevant to this litigation, Paul Cohen served as National's sole shareholder, chief executive officer and president. National was in the business of printing and distributing advertising inserts for newspapers throughout the country. In producing and distributing these inserts, National relied on a uniquely designed software package that included a sophisticated proprietary database containing the raw data needed to produce the advertising inserts. National's business operations ran smoothly until 1994, when relations began to sour between Cohen and Eric Richmond and Karen Clarke, two employees with whom Cohen had built National's business. On December 30, 1994, Richmond and Clarke, as well as a number of other employ-

---

it, and consider whether the Appellate Court properly affirmed the trial court's refusal to charge the jury on Hartford's special defense of late notice.

[2] National claims that the record is not adequately preserved. This claim is without merit. It is well established that a party may preserve for appeal a claim that an instruction was defective either by: (1) submitting a written request to charge the covering matter; or (2) taking an exception to the charge as given. *Lin* v. *National Railroad Passenger Corp.*, 277 Conn. 1, 13, 889 A.2d 798 (2006); see also Practice Book § 16-20. Hartford properly objected to the jury charge and specifically asked the trial court to instruct the jury on late notice. The claim was preserved for appeal.

ees of National, confronted Cohen and demanded that he relinquish control of the company. Without resolving the dispute, Cohen left National's premises and traveled to Florida. On January 1, 1995, Cohen received letters of resignation from Richmond and Clarke.

On January 3, 1995, upon his return from Florida, Cohen discovered that some of National's property was missing, including computers, customer files, business records, as well as backup discs that contained National's computer software and databases. Cohen did not realize the full extent of the loss until on or about January 20, 1995, when he attempted, with the assistance of two remaining employees, to fill a small order for inserts. While processing the order, Cohen discovered that the computer system did not function properly. He and his employees proceeded to fill the order manually, that is, without the aid of the computer system. Because the computer system did not function properly, Cohen and his remaining employees were unable to fill the large orders for inserts that were necessary to keep the company solvent. National has not filled any orders for inserts since the January 20, 1995 order.

Because National's insurance policies were among the missing items and National's insurance coverage had not been within Cohen's purview, Cohen did not discover that National carried insurance with Hartford until January 25, 1995, when an invoice for a premium payment arrived from Hartford. This invoice referenced J. M. Layton and Company, Inc. (J. M. Layton), a third party insurance broker from whom National had procured the insurance policy. On January 30, 1995, Cohen called J. M. Layton and informed its chief executive officer, David Woodward, of the loss that National had suffered in early January, 1995, and the effect of the loss on National's ability to conduct business.

Woodward did not notify Hartford of National's claim until March 10, 1995, when he sent by facsimile to Hartford a form indicating that National was submitting a claim for employee dishonesty or employee theft. In this facsimile, Woodward also included a letter that he had received from Susan Guthrie, counsel retained by Cohen to represent National in its pursuit of its insurance claim. Guthrie's letter informed Woodward in writing of National's January, 1995 loss and its effect on National's business, and specifically stated that the business had been unable to operate since the losses had occurred.[3]

On the basis of the information that Woodward had transmitted, Gaspar Kuhn, an adjuster employed by Hartford, determined that the information supplied was insufficient to allow him to determine whether National was entitled to coverage under the policy. According to Kuhn, he thought that, at best, National might be entitled to coverage for its employee dishonesty claim. As for the employee dishonesty claim, Kuhn concluded that although a reported theft could have implicated the business interruption and extra expense coverage sections of the insurance policy, Woodward had not provided enough information to warrant coverage under either of those provisions. On March 13, 1995,

---

[3] Guthrie sent Woodward a letter that stated in relevant part: "Please be advised that this office has been retained to represent the interest of [National] with respect to losses it sustained as a result of theft, sabotage and other damage caused by former employees of [National] in late December of 1994. I understand that you have already spoken with . . . Paul Cohen president of [National] regarding these losses. As you are aware, *since the time these losses occurred, [National] has been unable to operate* and this inability to operate arises out of both the physical loss of several computers as well as the deletion and/or destruction of various computer programs essential to the operation of the business of [National]. Therefore, under the above-referenced policy [National] is herein making a claim against various portions of the coverage afforded with respect to these losses. Please forward the appropriate claim forms to my office for completion by [National]. . . ." (Emphasis added.)

Kuhn sent a letter to Guthrie in response, enclosing proof of loss forms and explaining that completion of the proof of loss forms was necessary to aid Hartford in its investigation of National's claim. On June 19, 1995, because he had not received any response to his March 13 letter, Kuhn sent a second letter, noting that Guthrie had not returned his telephone calls and asking her to contact him. On July 24, 1995, Kuhn sent Guthrie a third letter, again noting that he had not yet received a proof of loss form from her, and requesting that she return the enclosed proof of loss form to him, explaining that he was unable to proceed with the investigation until the form was returned.

Following Guthrie's failure to reply, National responded to Kuhn's requests for information in August, 1995, when Eric Von Brauchitsch, a public adjuster hired by National to assist it in pursuing insurance coverage, telephoned Kuhn and informed him that National intended to assert claims for coverage under the business interruption and extra expense sections of the policy. Concluding that National's claim would be much larger and more complex than an employee dishonesty claim, Kuhn transferred National's claim to Thomas Effley, an adjuster employed by Hartford who had more experience handling larger claims.

The record reflects the following additional procedural history. At trial, National alleged that Hartford had breached the insurance contract by failing to pay National's claim. Based on a condition precedent set forth in § E.3.b of the policy, which specifies the insured's duties in the event of loss or damage, Hartford asserted as a special defense that National had failed to provide prompt notice to Hartford. Section E.3.b states in relevant part that the insured must "[g]ive [Hartford] prompt notice of the loss or damage. . . ." At the conclusion of evidence, the trial court declined to give the jury Hartford's requested instruction on its

special defense of late notice, and the jury subsequently returned a verdict in favor of National. The trial court rendered judgment in accordance with the verdict awarding $1,100,314.37 in damages to National.[4]

Hartford then appealed from the judgment of the trial court to the Appellate Court, claiming, inter alia, that the trial court improperly had failed to instruct the jury on its special defense of late notice. *National Publishing Co.* v. *Hartford Fire Ins. Co.*, supra, 94 Conn. App. 237. The Appellate Court, assuming without deciding that the failure to give the requested instruction was improper, concluded that any such failure was harmless error. Id., 271. In arriving at this conclusion, the court first determined that National provided notice to Hartford on January 30, 1995, when National contacted J. M. Layton. Id., 274–75. Central to its determination that notice to J. M. Layton constituted notice to Hartford was the Appellate Court's determination that J. M. Layton was Hartford's agent. Id., 275. On the basis of that finding and testimony by Kuhn and Woodward that, in their opinion, Hartford was not prejudiced, the court concluded that National satisfied its burden to show that Hartford was not prejudiced by the timing of the notice. Id., 273–75. The Appellate Court then concluded that, because National had met its burden of demonstrating that Hartford was not prejudiced by the timing of the notice, pursuant to our holding in *Aetna Casualty & Surety Co.* v. *Murphy*, 206 Conn. 409, 419, 538 A.2d 219 (1988), Hartford could not meet its burden of showing that a charge on late notice likely would have affected the outcome because "[t]he only testimony offered on the issue of prejudice demonstrated a lack of prejudice to Hartford, thereby satisfying National's burden of proof . . . ." *National Publishing Co.* v. *Hartford Fire Ins. Co.*, supra, 278. This certified appeal followed.

---

[4] The award reflected a remittitur in the amount of $238,533.79 upon the court's finding that the jury's award was excessive.

On appeal to this court, Hartford claims that the trial court's refusal to charge the jury on its special defense of late notice was improper because whether notice was timely and sufficient, and whether Hartford was prejudiced by any delay in notice presented disputed issues of fact for the jury to resolve. Hartford further argues that, because National failed to meet its burden to show that Hartford was not prejudiced by the timing of the notice, the result of the trial likely would have been different had the trial court instructed the jury on Hartford's special defense of late notice. National asserts that the record sufficiently demonstrates: (1) the timing of notice; (2) the sufficiency of notice; and (3) the form of notice required by the insurance policy. Finally, National argues that if this court should decide that notice was untimely, National has met its burden to demonstrate that Hartford suffered no material prejudice, and thus the instructional impropriety constituted harmless error. We agree with Hartford.

In determining whether the trial court improperly refused to give a requested charge, we review the evidence presented at trial in the light most favorable to supporting the proposed charge. *Matthiessen* v. *Vanech*, 266 Conn. 822, 828, 836 A.2d 394 (2003). "A request to charge which is relevant to the issues of [a] case and which is an accurate statement of the law must be given. . . . If, however, the evidence would not reasonably support a finding of the particular issue, the trial court has a duty not to submit it to the jury. . . . Thus, a trial court should instruct the jury in accordance with a party's request to charge [only] if the proposed instructions are reasonably supported by the evidence." (Citations omitted; internal quotation marks omitted.) Id., 828–29.

Under this standard of review, we must decide whether the requested charge accurately reflects the law and reasonably is supported by the evidence. That

charge would have instructed the jury that if it found that National had delayed in notifying Hartford, and that the delay was unexcused and unreasonable, such a delay would constitute a failure to comply with the policy's notice condition and would excuse Hartford from liability, unless the jury found that National had proven by a fair preponderance of the evidence that Hartford had suffered no material prejudice due to the late notice.[5] This instruction is an accurate statement

---

[5] The specific language of Hartford's requested instruction is as follows: "Hartford has asserted that coverage is forfeited because of the Duties in the Event of Loss or Damage provision in the policy. The policy provides in relevant part:

"3. Duties in The Event Of Loss Or Damages

"You must see that the following are done in the event of loss of or damage to [c]overed property.

"b. Give us prompt notice of the loss or damage. Include a description of the property involved.

"c. As soon as possible give us [a] description of how, when and where the loss or damage occurred.

"e. At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claims.

"f. Permit us to inspect the property and records proving the loss or damage.

"h. Send us a signed, sworn statement of loss containing the information we request to investigate the claim. You must do this within [sixty] days after our request. We will supply you with the necessary forms.

"i. Cooperate with us in the investigation or settlement of the claim.

"j. Resume part or all of your operations as quickly as possible.

"Under Connecticut law, an unexcused, unreasonable delay in notification constitutes a failure to comply with the policy's notice condition which entirely discharges an insurance company from any further liability on its insurance contract, unless, however, the insured proves by a fair preponderance of the evidence that the insurance company suffered no material prejudice from the late notice.

"The term as soon as practicable, used in [National's] policy, requires that notice be given within a reasonable time, under the circumstances. Neither negligence nor any mistakes on the part of the insured, if not caused by any act of the insurer, will excuse noncompliance with this contractual requirement.

"The insured bears the burden of establishing compliance with notice provisions in an insurance policy, and proving the reasonableness of any time period elapsing between the trigger event and the giving of notice.

of the applicable law. *Aetna Casualty & Surety Co.* v. *Murphy,* supra, 206 Conn. 417–18.

When Hartford pleaded late notice as a special defense, an uncommon system of burden allocation was set in motion. Although the general rule is that a defendant who pleads a special defense bears the burden on that issue, we have recognized an exception in the context of a special defense based on a claim that an insured has failed to comply with the terms of the insurance policy. *Gaudet* v. *Safeco Ins. Co.,* 219 Conn. 391, 402–403 n.11, 593 A.2d 1362 (1991). When an insured brings an action against an insurer for breach of the insurance contract, the insured bears the burden of proving that it complied with the terms of the contract, including the conditions. *Northrop* v. *Allstate Ins. Co.,* 247 Conn. 242, 254, 720 A.2d 879 (1998). Ordinarily, however, unless a defendant insurer affirmatively places such compliance at issue, it is presumed. See *Harty* v. *Eagle Indemnity Co.,* 108 Conn. 563, 565, 143 A. 847 (1928) ("it has become the established law of this [s]tate that one instituting an action upon an insurance policy is only obliged to allege in his complaint, in general terms, that the various conditions precedent stated in the policy have been fulfilled; that it is then incumbent upon the defendant, by way of special

"If you determine that late notice was provided by [National] to . . . Hartford, then you must find that [National] breached the notice condition of [its] policy, and further, you must find that there is no coverage, unless you conclude that [National] has proven that there was no material prejudice to . . . Hartford as a result of the late notice. However, the burden of establishing lack of prejudice must be borne by the insured, who, in this case, is [National].

"*Aetna Casualty & Surety Co.* v. *Murphy,* [supra, 206 Conn. 417–18]; *United Technologies Corp.* v. *American Home Assurance Co.,* 989 F. [Sup.] 128, 137–140 ([D. Conn.] 1997); [3 G. Couch, Insurance (3d Ed. 1999) § 190:11 pp. 190-25 through 190-26]; *McMahon* v. *New London County Mutual Ins. Co.,* [Superior Court, judicial district of New Haven, Docket No. CV-98-0408032 (August 23, 1999)] citing to, *Aetna Casualty & Surety Co.* v. *Murphy,* [supra, 418–20]." (Internal quotation marks omitted.)

defense, to set up such failures to comply with such conditions as it proposes to claim; that the burden rests upon the plaintiff to prove compliance with the conditions so put in issue, but that, as to other conditions precedent, compliance is presumed, without offer of proof by the plaintiff"). When a defendant pleads failure to comply with the terms of an insurance policy as a special defense, the usual presumption of compliance is extinguished, and the insured carries the burden of proving compliance with the insurance contract, including the conditions precedent to coverage. In the present case, because Hartford pleaded late notice as a special defense, National, rather than Hartford, bore the burden to show that notice was timely and sufficient, and that Hartford was not materially prejudiced by any unreasonable delay in notice.

In *Aetna Casualty & Surety Co.* v. *Murphy*, supra, 206 Conn. 419, we first set forth the rule that an insured bears the burden to show that the insured's late notice did not prejudice a defendant insurer. Because of the unusual nature of that burden allocation, which places upon an insured the burden of proving a negative, a review of the reasoning underlying the rule is helpful. Prior to our decision in *Murphy*, our precedent already had established that "absent waiver, an unexcused, unreasonable delay in notification constitutes a failure of condition that entirely discharges an insurance carrier from any further liability on its insurance contract." Id., 412. That rule was based on the basic "principle that contracts should be enforced as written, and that contracting parties are bound by the contractual provisions to which they have given their assent." Id. The harshness of that bright line rule had been the subject of the dissent in *Plasticrete Corp.* v. *American Policyholders Ins. Co.*, 184 Conn. 231, 243, 439 A.2d 968 (1981) (*Bogdanski, J.*, dissenting) (commenting that "[t]here

is no sound reason, in logic or equity, why the insurer should have the benefit of a conclusive presumption").

In *Murphy*, we recognized that rigid application of the general rule discharging an insurer's liability when an insured has failed to comply with the notice provisions of the policy, without any initial inquiry into whether the insurer was prejudiced by the timing of the notice, would likely yield a " 'disproportionate forfeiture.' " *Aetna Casualty & Surety Co.* v. *Murphy*, supra, 206 Conn. 413. Although we noted that most jurisdictions placed the burden upon an *insurer* to show prejudice before being discharged from liability due to an *insured's* late notice, we opted instead to place the burden on the *insured* to show that the *insurer* had not been prejudiced by the timing of the notice. Id., 418–19. In arriving at this rule, we balanced the competing principles of protecting an insured from disproportionate forfeiture and safeguarding an insurer's "legitimate interest in protection from stale claims." Id., 417. In this regard, we noted that "[t]he purpose of a policy provision requiring the insured to give the company prompt notice of an accident or claim is to give the insurer an opportunity to make a timely and adequate investigation of all the circumstances." (Internal quotation marks omitted.) Id. In explaining why the insured should bear the difficult burden of proving lack of prejudice to the insurer, we noted that an insured who bears this burden has not provided timely notice, and, therefore, is "seeking to be excused from the consequences of a contract provision with which he has concededly failed to comply." Id., 419–20. Under the system of burden allocation we adopted in *Murphy*, then, a fact finder must engage in a factual inquiry into whether an insured was prejudiced by any delay in notice; id., 417–18; and the "burden of establishing lack of prejudice must be borne by the insured." Id., 419.

In examining the question of whether the requested charge reasonably was supported by the evidence presented at trial, we are mindful of two principles. First, as we have noted, we examine that evidence in the light most favorable to supporting the proposed charge. Second, we note that this particular requested charge must be understood in light of the unusual circumstance that, although the charge concerned a special defense, with respect to which a defendant would ordinarily bear the burden of proof; *Verspyck* v. *Franco*, 274 Conn. 105, 112, 874 A.2d 249 (2005); with regard to this special defense, it was National, not Hartford, who bore the burden of proof, both to show that notice was timely, and, if National failed to sustain its burden to show timely notice, to show lack of prejudice to Hartford. *Gaudet* v. *Safeco Ins. Co.*, supra, 219 Conn. 402–403 n.11; *Aetna Casualty & Surety Co.* v. *Murphy*, supra, 206 Conn. 419.

Applying this standard, we review the evidence presented at trial to determine whether that evidence reasonably supported the requested charge. We turn first to the evidence as to the timing of the notice. National presented evidence in support of its contentions that it provided timely notice on January 30, 1995, and, in the alternative, late notice on March 10, 1995. Hartford presented evidence that National did not provide *sufficient* notice until August, 1995. We summarize the evidence in the record as to each of these claimed dates of notice.

First, in support of National's claim that it provided Hartford with timely notice on January 30, 1995, National relies on evidence that Cohen contacted J. M. Layton on that date, and that J. M. Layton was the agent of Hartford. Specifically, both Cohen and Woodward testified that Cohen called J. M. Layton on January 30, 1995, to inform Woodward that National had sustained a theft of equipment and records and damage to its

computer system. In support of its claim that J. M. Layton was Hartford's agent, National offered Woodward's testimony about the nature of the business relationship between J. M. Layton and Hartford, and Effley's testimony that J. M. Layton was Hartford's agent.[6]

"The existence of an agency relationship is a question of fact." (Internal quotation marks omitted.) *Wesley* v. *Schaller Subaru, Inc.*, 277 Conn. 526, 543, 893 A.2d 389 (2006). In *Beckenstein* v. *Potter & Carrier, Inc.*, 191

[6] Effley's prior deposition testimony was admitted into evidence at trial under the prior testimony exception because Effley had died prior to trial.

The Appellate Court concluded that J. M. Layton was Hartford's agent on the ground that Hartford, through Effley, made an uncontested judicial admission as to the agency relationship between J. M. Layton and Hartford. In evaluating the evidence, the Appellate Court stated: "Effley, an adjuster with Hartford for twenty-eight years, testified that he exclusively handled large property losses for Hartford and that National's claim was given to him in August, 1995, by his supervisor, Gaspar Kuhn. He further testified that J. M. Layton was Hartford's agent and that Kuhn had received the first report of National's loss from this agent. . . .

"Reviewing the record, we can find no evidence that contradicts this testimony and conclude that Effley's statement was an uncontested admission that J. M. Layton was its agent. Although Hartford argues that J. M. Layton was not its agent, the only evidence offered at trial supports a contrary conclusion. Accordingly, we find no merit in Hartford's argument . . . ." *National Publishing Co.* v. *Hartford Fire Ins. Co.*, supra, 94 Conn. App. 274–75. National, in its brief, and at oral argument, argues that the Appellate Court properly concluded that J. M. Layton was Hartford's agent.

The question of whether Effley had the authority to bind Hartford to such an admission turns on principles of agency law. "Corporations generally have the power to appoint agents with full authority to do acts or enter into contracts within the powers of the corporation. . . .

"The appointment of an agent for a corporate principal, as for an individual principal, need not be in writing, and may be presumed or inferred from circumstances. Accordingly, a written authority, vote, or resolution of the corporation need not be shown to establish an agency from a corporation or to extend the scope of an agency in a known and recognized agent to do certain acts on behalf of the corporation; a corporate agent may, as a general rule, be appointed by parol." 18B Am. Jur. 2d 222, Corporations § 1183 (2004). As we discuss in this opinion, the determination of an agency relationship is a question of fact, which we cannot, as an appellate tribunal, appropriately resolve. *First National Bank of Litchfield* v. *Miller*, 285 Conn. 294, 302, 939 A.2d 572 (2008).

Conn. 120, 133, 464 A.2d 6 (1983), we set forth the elements required to show the existence of an agency relationship: "(1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking." (Internal quotation marks omitted.) We also emphasized in *Beckenstein* that "[t]he existence of an agency relationship is a question of fact. . . . Some of the factors listed by the Second Restatement of Agency in assessing whether such a relationship exists include: whether the alleged principal has the right to direct and control the work of the agent; whether the agent is engaged in a distinct occupation; whether the principal or the agent supplies the instrumentalities, tools, and the place of work; and the method of paying the agent. See 1 Restatement (Second) Agency, §§ 14, 220 [1958] . . . . In addition, [a]n essential ingredient of agency is that the agent is doing something at the behest and for the benefit of the principal. . . . Finally, the labels used by the parties in referring to their relationship are not determinative; rather, a court must look to the operative terms of their agreement or understanding." (Citations omitted; internal quotation marks omitted.) *Beckenstein* v. *Potter & Carrier, Inc.*, supra, 133–34. Because of the fact-centered nature of the agency inquiry, we cannot make any determination regarding whether J. M. Layton was, or was not, Hartford's agent. See *State* v. *Lawrence*, 282 Conn. 141, 156, 920 A.2d 236 (2007) (appellate tribunal does not assess credibility or find facts; does not retry, but reviews proceedings of trial court). Therefore, the question of whether National provided timely notice to Hartford on January 30, 1995, was a question of fact for the jury.

Second, in support of its alternate contention that it provided notice to Hartford on March 10, 1995, National points to the evidence presented at trial regarding the

facsimile that Woodward sent on that day to Hartford. Specifically, National presented the testimony of Woodward and Kuhn that the facsimile informed Hartford of National's loss and of its intent to file a claim. National particularly relies on the statement in Guthrie's letter, included in the facsimile, stating that "since the time these losses occurred, [National] has been unable to operate and this inability to operate arises out of both the physical loss of several computers as well as the deletion and/or destruction of various computer programs essential to the operation of the business of [National]." See footnote 3 of this opinion.

Third, we review the evidence that would support Hartford's contention that National did not provide notice until August, 1995. Hartford contends that National's showing must be more than a showing that *some* notice was given. Instead, Hartford argues, National must establish when it gave sufficient notice of a business interruption claim. Hartford relies on the language of the policy's notice provision, which requires that the insured "[g]ive [Hartford] prompt notice of the loss or damage. Include a description of the property involved." The policy also requires that the insured must "[a]s soon as possible [give Hartford] a description of how, when and where the loss or damage occurred." Those policy requirements, Hartford argues, require the conclusion that National did not provide sufficient notice until August, 1995. In support of this argument, Hartford points to Kuhn's testimony that the March 10, 1995 facsimile from Woodward did not provide him with enough information to determine whether the policy's business interruption coverage was triggered. The three letters that Kuhn sent to National via Guthrie, on March 13, 1995, June 19, 1995, and July 24, 1995, support Kuhn's assertion at trial that he did not have sufficient information to determine the exact nature of National's claim. All three of the letters requested that National fill out and return the proof of loss form, and the July 24,

1995 letter specifically informed National that Kuhn was unable to proceed with the investigation until National returned the forms.

In addition, Hartford relies on Woodward's testimony that, when he sent the March 10, 1995 facsimile to Hartford, he was unaware that National was making a business interruption claim, and that he had not interpreted Guthrie's letter as asserting a business interruption claim. Hartford cites as support the property loss notice that Woodward sent via facsimile to Hartford on March 10, 1995. That form indicated that National's claim was for "employee dishonesty" and "vandalism," and also indicated that employees had stolen computer equipment. The form made no mention of a loss based on business interruption. Hartford also relies on Effley's testimony that, when the claim first came to Hartford, those working on the claim did not know the exact nature of the loss. Finally, Hartford points to evidence that National did not submit the proof of loss forms until August, 1995.[7] Kuhn testified that he received proof

---

[7] National asserts that, in claiming that it did not receive adequate notice until it received the proofs of loss in August, 1995, Hartford conflates notice of loss with both proof of loss and notice of claim for specific coverage. National argues that the language of the contract indicates that National was not obligated to make such a specific showing to satisfy the prompt notice requirement. National asserts that the contract required " 'prompt notice of the loss or damage,' including 'a description of the property involved,' " and under the applicable law, this initial duty to give notice of the loss is satisfied so long as National made a good faith effort to provide Hartford with the facts available to National at the time of notice. National further asserts that once it provided notice of loss, it was Hartford's responsibility, not National's, to determine what coverage applied under the terms of the policy, and to provide National with the appropriate proof of loss forms for business interruption coverage—something Hartford never did.

Hartford responds that, until August, 1995, National did not provide sufficient information to allow Hartford to determine that National was asserting a claim for business interruption coverage. Hartford additionally points to the fact that Woodward, the only other professional involved in processing National's claim, also testified that, based on the information sent by facsimile to Hartford on March 10, 1995, Woodward did not interpret those materials to assert a claim for business interruption coverage.

of loss forms—with regard to the business interruption and extra expense claims—in August, 1995, after he received notice, on August 2, 1995, that Von Brauchitsch would be representing National in his capacity as a public adjuster. Kuhn also testified that, after receiving these proof of loss forms from Von Brauchitsch, he turned National's claim over to Effley, who had more experience handling larger claims.

We next review the evidence presented by National to show that Hartford was not prejudiced by the timing of the notice. Because National contended that if notice was determined to have been given on January 30, 1995, it was timely, National presented no evidence regarding lack of prejudice to Hartford in connection with that date. As to March 10, 1995, National presented the testimony of Effley and Kuhn that Hartford did not send anyone to inspect National's premises until September, 1995, six months after Woodward sent to Hartford the facsimile that included Guthrie's letter.[8] Specifically,

---

[8] National also relies on Kuhn's testimony at trial that Hartford suffered no prejudice due to the timing of notice. Our examination of the trial transcript, however, reveals that Kuhn's testimony was much more limited in scope than National suggests, and more open to interpretation. The following colloquy occurred:

"Q. The question was even though you had sent a fidelity bond form under the employee dishonesty section to . . . Guthrie on behalf of National . . . you didn't receive that back from her, correct?

"A. That's correct.

"Q. But you did receive it from . . . Von Brauchitsch?

"A. Yes, sir.

"Q. As part of the package that was sent to you in regards to the overall proofs of loss in August of 1995, correct?

"A. Yes, sir.

"Q. Does your file reflect anywhere that . . . Hartford was prejudiced in any way by the fidelity bond form not being sent back to you until August of 1995?

"A. I would have no basis to say what is prejudiced. I never had enough information to base an opinion.

"Q. Okay. So the answer is no, there is nothing in the file that reflects that your company was prejudiced in any way by the bond form not being sent back until August of 1995, correct?

"A. That's correct, sir."

in September, 1995, Gregory Ashayeri, an independent computer expert retained by Effley, went to National's premises to investigate the claim. National points to no evidence of lack of prejudice in connection with the August, 1995 notice date, but asserts that the record does not support a finding that notice was given any later than March 10, 1995.

All of this evidence, taken together, establishes that the record reasonably supported the requested charge. The two principal questions remained unresolved, namely, the timing of the notice and any prejudice that the timing of notice may have caused Hartford. Additionally, many underlying questions of fact remained unresolved, such as the questions of agency and what would have been sufficient notice under the policy language. Therefore, these factual questions should have been submitted to the jury for resolution, and not resolved on appeal. See *State* v. *Lawrence*, supra, 282 Conn. 156 (role of appellate tribunal is to review, not retry trial proceedings). The trial court improperly refused to give the requested charge, because it was an accurate statement of the law and was reasonably supported by the evidence.

We turn now to the question of whether the instructional impropriety was harmful, an issue on which Hartford bears the burden to show that the impropriety likely affected the verdict. *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 243, 828 A.2d 64 (2003).

This conclusory statement equally could be interpreted to mean that Kuhn had no opinion as to whether Hartford was prejudiced, or that his records did not show evidence of prejudice, as to one specific factor only—the receipt of the fidelity bond form in August of 1995. Under either interpretation, and assuming that the jury would have found Kuhn's opinion on the issue probative, at best the testimony would suffice to show that Hartford's records failed to establish that Hartford had been prejudiced, which, if Hartford bore the burden to prove that it had been prejudiced, would be relevant. The testimony does little, however, to satisfy National's burden to show lack of prejudice.

If the trial court had given the requested instruction and the jury had determined that National failed to sustain its burden, Hartford would have been discharged from all liability. *Aetna Casualty & Surety Co. v. Murphy,* supra, 206 Conn. 411–12. The question, then, is whether Hartford can show that it was harmed by the trial court's failure to instruct the jury that Hartford was discharged from all liability unless National sustained its burden to show either that it provided timely notice, or, failing that, to show that Hartford was not prejudiced by late notice. In order to answer that question, we must examine the record more closely to determine whether National likely would have met its burden to make one of the two alternate showings. We engage in this inquiry mindful of the fact that the trial court's failure to give the requested instruction prevented the jury from making key factual findings, including: the timing of notice, specifically of the business interruption claim; whether J. M. Layton was Hartford's agent; when Hartford's investigation began; and, ultimately, whether Hartford was prejudiced by the timing of the notice.

We further note that the business income and extra expense coverage of the insurance policy, as set forth in the Special Property Coverage Form, was limited to "loss of [b]usiness [i]ncome that occurs within [twelve] consecutive months after the date of direct physical loss or damage," and, even more significantly, provided that Hartford agreed to "pay for the actual loss of [b]usiness [i]ncome [that National sustains] due to the necessary suspension of [National's] 'operations' during the 'period of restoration.' " The policy defines " '[p]eriod of [r]estoration' " as "the period of time that . . . (a) [b]egins with the date of direct physical loss or damage caused by or resulting from any covered [c]ause of [l]oss at the described premises, and (b) [e]nds on the date when the property at the described premises

should be repaired, rebuilt or replaced with reasonable speed and similar quality." The timing of the notice would be relevant to determining whether the period of restoration was affected by any delay in notice. Because National bore the burden to show that Hartford was not prejudiced by any delay in notice, National, in meeting that burden, would have to show that the period of restoration was not affected by any delay in notice in any way that would have prejudiced Hartford. The proof of this was in National's control. In order to assess whether National had met that burden, the jury would have had to make findings as to each delay following the date of damage, beginning with the original date of the damage, sometime on or before January 3, 1995; then to January 30, 1995, when National notified J. M. Layton; then to March 10, 1995, when Guthrie sent the fax to Hartford; and in August of 1995, when Von Brauchitsch informed Kuhn that National intended to assert claims for coverage under the business interruption and extra expense sections of the policy. For each period of delay, the jury would have had to consider the effect that the late notice had on the period of restoration and determine whether the late notice prejudiced Hartford. National would also have to show that the amount that it was requesting as damages did not include any damages accrued during a period of delay in notice. These are all findings of fact, and should have been made by the jury, but were never made because the trial court did not give the requested instruction.

The court then, in interpreting the policy on the basis of the jury's factual finding, would have had to decide in each instance whether National was entitled to recover under the business income and extra expense coverage portion of the policy. "[C]onstruction of a contract of insurance presents a question of law for the court which this court reviews de novo." (Internal quotation marks

omitted.) *Galgano* v. *Metropolitan Property & Casualty Ins. Co.*, 267 Conn. 512, 519, 838 A.2d 993 (2004).

We turn first to the question of whether National sustained its burden to show that it gave timely notice to Hartford. The only notice date that National contends would be deemed timely notice is January 30, 1995.[9] In order to show that it provided Hartford notice on that date, however, National would need to establish that J. M. Layton was Hartford's agent. That inquiry, as we already have noted, is a fact specific question for the jury. National would need to present evidence to show that: (1) Hartford made some manifestation that J. M. Layton would act on its behalf; (2) J. M. Layton accepted the undertaking; and (3) J. M. Layton and Hartford had an understanding that Hartford would control the undertaking. *Beckenstein* v. *Potter & Carrier, Inc.*, supra, 191 Conn. 132–34. National's evidence, which was limited to a few statements by Woodward and Effley to the effect that J. M. Layton was Hartford's "agent," is not sufficient to persuade us that, on the present record, National would have sustained its burden to show that J. M. Layton was Hartford's agent. See id., 133, 137 (labels used by parties in referring to their relationship are not determinative).

As to the question of whether a fact finder likely would have concluded, given the proper instruction, that National met its burden to show lack of prejudice, although we acknowledge that this presents a close question, our answer ultimately is guided by the difficult showing that National would have had to make under *Aetna Casualty & Surety Co.* v. *Murphy*, supra, 206

---

[9] Because National does not contend that notice given on March 10, 1995, or August, 1995, would be timely, and, therefore, makes no attempt to show that it sustained any burden to show the timeliness of those notice dates, it is unnecessary for us to consider whether National presented sufficient evidence to show that either of these dates would constitute timely notice to Hartford.

Conn. 419. Because National offered no evidence to show lack of prejudice to Hartford with respect to the August, 1995 notice date relied on by Hartford, we examine the evidence offered by National to show that Hartford was not prejudiced by notice given on March 10, 1995. That evidence consists of testimony establishing that Ashayeri, the computer consultant retained by Hartford, did not inspect National's premises until September, 1995. National contends that the fact that Hartford did not send anyone to inspect the premises until six months later establishes that Hartford was not prejudiced by notice given on March 10, 1995. We disagree.

National's argument rests on the premise that Hartford waited until September, 1995, to make any efforts to investigate National's claim. The record reveals, however, that although Hartford did not inspect National's premises until September, it made repeated efforts prior to that time to ascertain the nature of National's claim.[10] Three days after receiving the March 10, 1995 facsimile,

---

[10] National argues that the jury's answers to interrogatories preclude a finding that Hartford was prejudiced by the timing of notice. We note first that National misstates the burden, which it bears, to show lack of prejudice to Hartford. Second, the interrogatories did not ask the jury to consider the issue of the timing of notice, or any prejudice to Hartford from late notice.

Specifically, in response to interrogatories, the jury found that National had proved, by a preponderance of the evidence, that its claims qualified for insurance proceeds under the sections providing coverage for business loss, extra expense and employee dishonesty. The jury further found that Hartford had not sustained its burden on its special defense alleging that National had violated the conditions of the insurance policy by intentionally concealing or misrepresenting material facts regarding the claim. The jury also found that National had proved that it complied with the conditions of the insurance policy requiring cooperation in the investigation, provision of statements of loss containing requested information, and provision of inventories of damaged property and amount of loss claim.

These interrogatories make clear that the jury did not resolve: (1) whether National provided Hartford with timely notice—including the actual timing of the notice; (2) the type of notice required under the terms of the policy; (3) whether the notice provided was sufficient; (4) whether the delay in notification was reasonable; and (5) whether Hartford suffered any prejudice as a result of late notice.

Kuhn sent National's attorney, Guthrie, a letter requesting that National fill out and return enclosed proof of loss forms. Kuhn stated specifically in the letter that the request was in response to the report that Hartford had received from J. M. Layton on March 10, 1995. As we already have noted in this opinion, Hartford received no response to its request, so Kuhn sent two additional letters to Guthrie, seeking the same information, on June 19, 1995 and July 24, 1995. In the letter of June 19, 1995, Kuhn stated that he had attempted to contact Guthrie by telephone several times and left messages for her. National failed to respond until August, when Von Brauchitsch submitted proofs of loss on behalf of National, including one that constituted the first notice of a claim for business interruption coverage. At that point, Effley took over the investigation of National's claim.[11]

Although the question of whether a jury would have concluded that National met its burden to show either the timeliness of the notice or lack of prejudice to Hartford due to late notice is a close one, we are persuaded—both because of the fact bound nature of the inquiry under *Murphy*, and because of the difficult showing National would have to make to establish lack of prejudice to Hartford—that Hartford has met its burden to show that it was harmed by the failure to give the requested instruction. Specifically, as to the timing of the notice, National would have had to make a much more detailed showing to satisfy its burden to establish that J. M. Layton was Hartford's agent, a showing that would have been essential to a jury finding of a notice date of January 30, 1995. As to the remaining two notice dates, National would have retained the burden to persuade the jury that March 10, rather than August, was

---

[11] It is unclear from the record precisely when in August Effley began working on National's claim, or the extent of the work that he performed on the claim during that month.

the notice date, once again a fact bound inquiry. National's burden to show lack of prejudice would have been difficult to meet, even if one assumed that the jury would have concluded that March 10, 1995, was the notice date. We emphasize that National's entire lack of prejudice argument relies on Hartford's alleged delay in responding to notice. Although Hartford did not inspect National's premises until September, 1995, we cannot say that a jury necessarily would have found that Hartford conducted no investigation prior to that time. The question of when Hartford's investigation began, and, indeed, what actions of Hartford constituted an investigation of National's claim, are questions of fact. A jury reasonably could have found that Hartford began, at the very least, a preliminary investigation immediately upon receiving notice of the claim, and intensified its investigation in August, 1995, when it received the proof of loss forms that it had been requesting for three months. Viewing the investigation in the broader context, a jury could have determined that the investigation began on March 13, 1995, when Kuhn sent his first inquiry to Guthrie, three days after Woodward sent the facsimile to Hartford on March 10, 1995. It is difficult to see how a delay of three days could demonstrate a lack of prejudice due to the late notice. Accordingly, because National likely would have failed to meet its burden to show either that notice was timely or that Hartford was not prejudiced by the timing of notice, we conclude that Hartford has established that the failure to give the requested instruction was harmful error.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court and to remand the case to the trial court for a new trial.

In this opinion NORCOTT and ZARELLA, Js., concurred.

PALMER, J., with whom KATZ, J., joins, dissenting. The sole issue raised by this appeal is a straightforward one: whether a new trial is required due to the fact that the trial court improperly failed to instruct the jury on the defense raised by the defendant, Hartford Fire Insurance Company (Hartford), that it suffered material prejudice because the plaintiff, National Publishing Company, Inc. (National), had provided Hartford with late notice of its business interruption claim. A new trial would be necessary only if Hartford could establish on appeal that the outcome of the trial likely would have been different—that is, that the jury likely would have returned a verdict in favor of Hartford instead of National—if the requested charge on notice had been given. Hartford's only claim of prejudice is that National's allegedly late notice deprived Hartford of the ability to resolve National's computer problems so that National could have resumed its business operations and thereby avoid or mitigate any covered losses. There is absolutely nothing in the trial record, however, to indicate that Hartford suffered any prejudice at all as a result of the allegedly late notice because there is no evidence even to suggest that Hartford could have remedied National's computer problems, in January, 1995, March, 1995, August, 1995, or at any other time. The majority does not suggest otherwise. In fact, the only evidence adduced at trial pertaining to the issue of prejudice affirmatively demonstrates that Hartford suffered *no* prejudice. I therefore see no reason whatsoever to disturb the jury verdict.[1] Accordingly, I respectfully dissent.

---

[1] It is true, of course, that under *Aetna Casualty & Surety Co.* v. *Murphy*, 206 Conn. 409, 419, 538 A.2d 219 (1988), National would have borne the burden of persuading a properly instructed jury that Hartford had not suffered any material prejudice as a result of National's allegedly untimely notice. As I discuss more fully hereinafter, however, because the only evidence adduced at trial concerning prejudice indicated that Hartford suffered *none*, there simply is nothing in the record to support the majority's conclu-

The following facts are necessary to an understanding of the parties' claims. At all times relevant to this action, Paul Cohen was the sole shareholder, chief executive officer and president of National. By 1994, his associates, Karen Clarke and Eric Richmond, were running the company's day-to-day operations. Clarke researched potential clients and managed the company's finances, while Richmond developed the customized computer software program on which National's advertising insert business was based.

During 1994, Cohen's relationship with Clarke and Richmond began to deteriorate. On December 30, 1994, Cohen received a letter from Clarke, Richmond and several other National employees demanding that Clarke and Richmond be given an equity share in National and that Cohen agree to reduce his ownership share. The letter further informed Cohen that if these demands were not met, the group would force the company into involuntary bankruptcy.

When Cohen next returned to National's headquarters on January 3, 1995, he discovered that computers were missing from various offices throughout the building, and that money had been withdrawn from the company's bank accounts. In addition to various business and financial records, computer software was missing. Clarke, Richmond and several other employees never returned to work. Later in January, when Cohen attempted to fill an order for advertising inserts, he discovered that the computer program central to National's business had been corrupted, making it impossible for the company to operate.

Because insurance documents were among those missing from National's offices, Cohen did not become aware of National's insurance coverage until January

---

sion that a properly charged jury would have returned a verdict for National on its defense of prejudicial late notice.

25, 1995, when he received an invoice from J. M. Layton and Company, Inc. (J. M. Layton), National's insurance agent, for the premium on an insurance policy that had been issued to National by Hartford. On January 30, 1995, Cohen contacted David Woodward, chief executive officer of J. M. Layton, and informed him of National's losses. By letter dated February 28, 1995, Susan Guthrie, counsel for National, again informed Woodward of the loss. On March 10, 1995, Woodward forwarded Guthrie's letter to Hartford via facsimile, marking the first direct notice to Hartford of National's loss. That letter, which was attached to a property loss notice form that described National's property losses,[2] stated in relevant part: "Please be advised that this office has been retained to represent the interests of . . . National . . . with respect to losses it sustained as a result of theft, sabotage and other damage caused by former employees of [National] in late December of 1994. I understand that you have already spoken with . . . Paul Cohen . . . regarding these losses. As you are aware, since the time these losses occurred, [National] has been unable to operate and this inability to operate arises out of both the physical loss of several computers as well as the deletion and/or destruction of various computer programs essential to the operation of the business of [National]. Therefore, under the above-referenced policy [National] is herein making a claim against various portions of the coverage afforded with respect to these losses. Please forward the appropriate claim forms to my office for completion by [National]. . . ."

The record further reflects that, in response to the March 10, 1995 facsimile, Gaspar Kuhn, a claims adjuster at Hartford, sent Guthrie a proof of loss form

---

[2] The items identified on the form, which had been generated by J. M. Layton, included "computers, scanners, printers and computer programs stolen by former employees."

for a fidelity bond to be completed because the claim implicated the employee dishonesty section of the policy. The fidelity bond claim was capped under the insurance policy at $10,000 per claim. As the majority has explained, however, National did not return the proof of loss form to Hartford despite several requests from Kuhn over the following months.

In July, 1995, National hired Eric Von Brauchitsch, a public adjuster, to represent its interests in connection with its losses. In August, 1995, Von Brauchitsch submitted to Hartford, on behalf of National, a completed set of proof of loss forms describing National's claimed losses. Thereafter, Hartford began its investigation of National's claim in earnest. In particular, in September, 1995, Hartford retained a computer expert, Gregory Ashayeri, to determine what had occurred at National and to evaluate Hartford's exposure. By late 1996, when Hartford still had refused to acknowledge liability under its policy, National initiated the present action, alleging that Hartford had breached the insurance agreement by failing to pay National's claim. In its reply to National's complaint, Hartford asserted, inter alia, the special defense of late notice under § E.3.b of the insurance policy.[3]

At trial, National presented the testimony of Cohen and other National employees describing the sabotage that allegedly had been committed against the company by its former employees, as well as National's attempts to reconstruct the advertising insert program, to maintain business operations and to procure payment from Hartford for its losses. Hartford's primary defense was

---

[3] Section E.3 of the policy, which describes the insured's duties in the event of loss or damage, provides in relevant part: "[The insured] must see that the following are done in the event of loss or damage to [c]overed [p]roperty . . .

"b. Give us prompt notice of the loss or damage. Include a description of the property involved. . . ."

that National's claim under the policy was fraudulent in that Cohen had fabricated the account of employee sabotage.[4] Hartford also claimed that Cohen intentionally had thwarted National's efforts to resume business operations after the alleged sabotage, and had inflated the company's value, in order to collect additional insurance money. In addition to its claim of late notice, Hartford also maintained that National had breached § E.3.i of the insurance agreement by failing to cooperate with Hartford's investigation of National's claim.[5] In particular, Hartford claimed, on the basis of Kuhn's testimony, that between March and June, 1995, National did not reply to several inquiries by Kuhn regarding the status of completion of the proof of loss form for employee dishonesty that Kuhn had sent to National in response to the March 10, 1995 facsimile.

Near the conclusion of the trial, the parties filed their proposed jury instructions with the court. Hartford's request to charge included proposed instructions on its contentions that National had failed to provide timely notice of its claim and had failed to cooperate with Hartford once it did file such notice. At the charge conference, however, which followed the close of evidence, there was no specific discussion of the requested late notice instruction, and the instructions that the trial court gave to the jury contained no mention of the defense of late notice. Counsel for Hartford excepted to this omission, which the trial court noted without

---

[4] In his closing argument, counsel for Hartford argued: "[W]hat is at issue in this case is concealment, misrepresentation and fraud. Ladies and gentlemen, this is a fraudulent insurance claim. This claim was brought to scam the insurance company. It was brought to rip off the insurance company . . . . [T]hat is what this case is about . . . ."

[5] Section E.3.i of the policy provides that the insured must "[c]ooperate with [Hartford] in the investigation or settlement of the claim." Section E.3.c of the policy requires that, "[a]s soon as possible," National must provide Hartford with a "description of how, when and where the loss or damage occurred."

comment. The trial court, however, did charge the jury on Hartford's defense of lack of cooperation by National. Thereafter, the jury returned a verdict awarding National $414,317.48 in damages for lost business income, $914,530.68 for extra expenses and $10,000 for employee dishonesty.[6] The jury also made the specific finding, inter alia, that National had not breached its duty to cooperate with Hartford in its investigation of National's claims.[7]

Hartford appealed from the judgment of the trial court to the Appellate Court, which, after a thorough analysis of each of Hartford's five separate claims, affirmed the trial court's judgment.[8] *National Publishing Co.* v. *Hartford Fire Ins. Co.*, 94 Conn. App. 234, 237, 892 A.2d 261 (2006). With respect to Hartford's contention that the trial court improperly had failed to instruct the jury on Hartford's claim of late notice, the Appellate Court, after a careful and detailed review of the record, concluded that, even if that failure was

[6] The trial court rendered judgment for National in accordance with the jury verdict but ordered a remittitur of $238,533.79. The remittitur is not an issue in this appeal.

[7] The jury interrogatory on the issue of cooperation under the policy provides in pertinent part: "Has . . . National . . . proved, by a preponderance of the evidence, that it complied with the conditions of the subject insurance policy requiring cooperation in the investigation, the provision of statements of loss containing requested information, and the provision of inventories of damaged property and amount of loss claim?" The jury answered "Yes."

[8] On appeal to the Appellate Court, Hartford claimed that the trial court improperly had denied its postverdict motions for judgment notwithstanding the verdict and to set aside the verdict because: "(1) National failed to establish any damages . . . (2) the court improperly admitted a summary spreadsheet into evidence without a proper foundation; (3) the court failed to charge the jury on Hartford's special defense that National failed to give proper notice of its claim pursuant to the policy; (4) the court improperly denied Hartford's motion for a mistrial after National's counsel made inflammatory remarks during closing argument; and (5) the court improperly excluded evidence regarding a prior felony conviction of National's principal . . . Cohen." *National Publishing Co.* v. *Hartford Fire Ins. Co.*, 94 Conn. App. 234, 237, 892 A.2d 261 (2006).

improper, it was harmless. Id., 278. We granted Hartford's petition for certification limited to the following issue: "Did the Appellate Court properly affirm the trial court's refusal to charge the jury on [Hartford's] late notice of special defense?"[9] *National Publishing Co.* v. *Hartford Fire Ins. Co.*, 278 Conn. 903, 896 A.2d 105 (2006). I do not agree that Hartford has met its burden of demonstrating that the instructional impropriety was harmful because Hartford cannot establish that the outcome of the trial likely would have been different if the court had given the requested instruction.[10]

Before explaining my disagreement with the majority on the ultimate issue of whether Hartford has met its burden of demonstrating that the instructional impropriety affected the verdict, I first address Hartford's claim, endorsed by the majority, that the jury reasonably could have found that the March 10, 1995 facsimile was insufficient to constitute notice of a potential business interruption loss as required under National's policy and, therefore, that National did not receive such notice until August, 1995. Although Hartford cannot prevail on its claim that it is entitled to a new trial even if it did not receive notice until August of 1995, Hartford's

---

[9] For purposes of the certified question, there is no dispute that, if this court concludes that the trial court improperly failed to charge the jury on Hartford's defense of late notice, then we also must decide whether that impropriety was harmful.

[10] I do agree with the majority that the trial court should have given the requested charge because the timeliness of the notice was a question for the jury to decide. As the majority has indicated, the jury reasonably could have concluded that Hartford received notice of National's loss via J. M. Layton on January 30, 1995, if the jury also concluded that J. M. Layton was Hartford's agent. The determination of whether an agency relationship exists, however, involves a factual inquiry and, therefore, ordinarily gives rise to a jury question. Although it is reasonably likely that the jury would have found that J. M. Layton was, in fact, Hartford's agent, the jury could have come to a contrary conclusion. As I explain more fully hereinafter, however, the record establishes that Hartford received notice of a possible business interruption claim no later than March 10, 1995.

claim of prejudice is predicated on its assertion that it did not receive notice until August, an assertion that is defeated by the contents of the March 10, 1995 facsimile.

It is clear that Guthrie's letter, which was attached to the property loss notice in the March 10, 1995 facsimile, provided Hartford with sufficient notice of National's claims as a matter of law. The specific terms of the insurance policy required only that National provide "prompt notice of the loss or damage," including a "description of the property involved." Thus, the policy obligated National to provide Hartford with notice of the general nature of the loss, and not with notice of the specific claim or claims that it intended to make. See 13 G. Couch, Insurance (L. Russ & T. Segalla eds., 3d Ed. 2005) § 186:32, p. 186-60 ("[i]n the context of property insurance . . . notice of loss requires only that the [insured] furnish the insurer with the best information as to the facts which [the insured] possesses at the time, and that [the insured] act in good faith in giving such notice"). The import of Guthrie's March 10, 1995 letter as notice of a business interruption loss is perfectly apparent: the letter stated that "since the time these losses occurred, [National] *has been unable to operate and this inability to operate* arises out of both the physical loss of several computers as well as the deletion and/or destruction of various computer programs *essential to the operation of the business of [National]*." (Emphasis added.) It is hard to imagine how National could have provided any clearer notice to Hartford that its business had been interrupted. Indeed, National explained that it had been unable to operate its business *at all* following the acts of theft and sabotage that were committed against the company in late December, 1994.[11] Guthrie closed the letter, moreover,

---

[11] In concluding that a legitimate factual question existed as to whether the March 10, 1995 notice was sufficient, the majority ignores Guthrie's letter and examines the contents of the property loss notice form in isolation. The majority states that "[t]he form made no mention of a loss based on business interruption." The facsimile notice, however, also included Guth-

by stating, "[t]herefore, under the above-referenced policy [National] is herein making a claim against *various portions of the coverage afforded with respect to these losses.*" (Emphasis added.) As Kuhn testified, it was Hartford's duty, and not National's responsibility, to determine what specific coverage provisions of the policy were triggered by the notice.[12]

Although Kuhn initially testified that he thought that the employee dishonesty section of the policy was applicable, his opinion was based on his reading of the property loss notice form, which comprised the first page of the March 10, 1995 facsimile. Kuhn further stated that if he had read the notice form together with Guthrie's letter, which was attached, other sections of the policy, including the business interruption coverage provision, might have been triggered. Indeed, the property loss notice form that Kuhn had relied on explicitly stated, in the box designated "[r]emarks," that the reader should "see [attorney] letter."[13] The fact that Kuhn, through inadvertence or neglect, failed to read Guthrie's letter, cannot possibly justify the conclusion

rie's letter, which plainly stated that National "has been unable to operate" since it had lost the use of its computers in January, 1995.

[12] Kuhn acknowledged that it was part of his job to determine, on the basis of the notice provided, what coverage might be triggered under the policy. Kuhn also testified that he did not consult with anyone who had more experience in dealing with computer loss claims, and that to his knowledge, there was no one at Hartford who had experience in handling claims related to allegations of computer sabotage and theft.

[13] The majority relies on Kuhn's testimony to support its conclusion that the jury reasonably could have found that the March 10, 1995 facsimile did not suffice as adequate notice of a possible business interruption loss under the policy. In particular, the majority contends that Kuhn testified that the March 10, 1995 facsimile "did not provide him with enough information to determine whether the policy's business interruption coverage was triggered." Contrary to the majority's assertion, however, Kuhn testified merely that he could not discern from the March 10, 1995 facsimile whether National had suffered *any compensable loss* under the policy, including any loss due to employee dishonesty, sabotage or theft; such a determination could be made only after an investigation of the representations set forth in the notice.

that the March 10, 1995 facsimile was insufficient to constitute notice of a possible business interruption loss, especially in light of Kuhn's duties as the adjuster responsible for National's account. In addition, Woodward testified that the notice form that had been sent to Hartford via facsimile on March 10, 1995, when read in conjunction with the attached letter from Guthrie, should have alerted Hartford to a potential business interruption loss claim.

Despite this notice in March, the record demonstrates that Hartford did not begin to investigate the circumstances surrounding National's possible business interruption loss until September.[14] Thus, any prejudice that Hartford might have suffered by virtue of its failure to investigate the matter until September is due solely to its failure to act more promptly. The fact is, however, that there is nothing in the record to indicate that Hartford suffered any prejudice, irrespective of whether it received notice of National's potential business interruption loss claim in January, March or August. Consequently, even if Hartford is deemed to have received untimely notice of that potential claim, Hartford cannot satisfy its burden of demonstrating that the outcome of the trial would have been different if the trial court had instructed the jury on its claim of late notice, the issue to which I now turn.

The standard of review for an instructional impropriety is well established. "[I]t is axiomatic . . . that not

---

[14] The majority suggests that the jury reasonably could have found that Hartford commenced its investigation shortly after receiving the March 10, 1995 facsimile, but that its efforts were thwarted by National's failure to respond to several inquiries by Hartford concerning the status of National's completion of the proof of loss form for employee dishonesty that Kuhn had forwarded to National after receiving the March 10, 1995 facsimile. To the extent that these inquiries possibly could be characterized as investigatory in nature, however, Kuhn's testimony established that they related only to a possible claim under the employee dishonesty section of the policy. Moreover, the jury expressly found that National had cooperated with Hartford as required under the policy.

every error is harmful. . . . [B]efore a party is entitled to a new trial . . . he or she has the burden of demonstrating that the error was harmful. . . . An instructional impropriety is harmful if it is likely that it affected the verdict. . . . In determining whether an instructional impropriety was harmless, we consider not only the nature of the error, including its natural and probable effect on a party's ability to place his full case before the jury, but the likelihood of actual prejudice as reflected in the individual trial record, taking into account (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (Internal quotation marks omitted.) *Allison* v. *Manetta*, 284 Conn. 389, 400, 933 A.2d 1197 (2007). Thus, in deciding whether the improper failure to give a requested jury instruction constituted harmful error, we must examine the record to determine whether the jury likely would have reached a different verdict had the requested charge been given. See, e.g., *George* v. *Ericson*, 250 Conn. 312, 327, 736 A.2d 889 (1999) ("[t]he harmless error standard in a civil case is whether the improper ruling would likely affect the result" [internal quotation marks omitted]).

Hartford contends that it suffered material prejudice as a result of the allegedly late notice because that tardy notice prohibited Hartford from investigating *and resolving* National's computer problems, a course of action that Hartford contends would have made it possible for National to resume its business operations instead of shutting down. There simply is nothing in the record, however, to indicate that Hartford had the ability or the expertise to accomplish that task, no matter how early it received notice that National's computers had been sabotaged. Moreover, as the Appellate Court observed in rejecting Harford's claim, the only evidence adduced at trial that specifically concerned

the issue of prejudice demonstrated that Hartford had suffered none. See *National Publishing Co.* v. *Hartford Fire Ins. Co.*, supra, 94 Conn. App. 278. In particular, when questioned whether Hartford had been prejudiced by National's alleged failure to provide more timely notice, Kuhn, who had twenty-five years experience as an adjuster, was unable to identify any such prejudice on the basis of the contents of his file. As the adjuster responsible for National's file from the time he personally became aware of National's possible loss in March until he turned the case over to another Hartford adjuster in August, Kuhn's inability to point to any harm resulting from the notice that Hartford received completely undermines Hartford's claim of prejudice.[15] In addition, Woodward, the former chief executive officer of J. M. Layton, testified that he did not believe that Hartford had been prejudiced by the timing of the March 10, 1995 notice.

In contrast to the testimony of Kuhn and Woodward, there is not one shred of evidence to indicate that National's failure to provide Hartford with more timely notice was prejudicial to Hartford. Thus, there is nothing in the record to indicate that Hartford was hampered in its investigation of National's claim because, for example, a key witness had died or otherwise had become unavailable to Hartford at any time before it received notice under the policy. Nor is there any sug-

---

[15] Kuhn's testimony is powerful—and uncontroverted—evidence of lack of prejudice. Indeed, it is hard to imagine testimony from a Hartford employee that would be more probative of the fact that National had not suffered any prejudice, let alone any material prejudice. After all, Kuhn was the Hartford employee assigned to National's account from the date of the loss in January, 1995, an assignment he retained until August, 1995. As the Hartford adjuster responsible for handling National's claim, Kuhn was uniquely situated to know whether Hartford had been prejudiced in any way by the allegedly late notice. If Kuhn could not identify any such prejudice, there is no reason to think that anyone else could have done so, and neither Hartford nor the majority has suggested any such person.

gestion in the record that any documents were lost or that any other evidence was rendered unavailable prior to that notice date. Finally, as stated previously, there is no evidence—none—indicating that Hartford could have remedied National's computer problems, and thereby reduced Hartford's exposure under its policy, if it had received earlier notice of National's potential loss. On the basis of the record, therefore, ordinarily there would be no question that the trial court's failure to give the requested charge on notice was harmless because there is absolutely nothing on which the jury could have predicated a finding of prejudice stemming from late notice.

As the majority has explained, however, this court held in *Aetna Casualty & Surety Co.* v. *Murphy*, supra, 206 Conn. 419, that when an insured provides late notice of an insurance loss, the insured bears the burden of establishing that the insurer suffered no material prejudice as a result of the late notice.[16] Thus, at trial, if the requested instruction had been given, and if the jury had found that notice was late, the jury would not have been required to find prejudice stemming from the late notice; rather, National would have been required to demonstrate to the jury that Hartford suffered no material prejudice due to the late notice. In concluding that National probably would not have met this burden, the majority ignores the complete absence of prejudice in the record.

---

[16] I have a serious question as to whether the burden shifting approach that we adopted in *Murphy* is the best and most fair approach because it places the burden on an insured to prove a negative, that is, that the late notice under the policy did not prejudice the insurer. Because the insurer, and not the insured, will possess the information relevant to the question of whether the untimely notice resulted in any undue prejudice to the insurer, it seems more reasonable for the insurer to bear the burden of proving that it was so prejudiced by the late notice that it is entitled to be relieved from its payment obligation under the policy. This issue is not the subject of this appeal, however, and I therefore do not address it further.

Because Hartford raised the special defense of late notice in its answer to National's complaint, and because the trial court did not decline to charge the jury on the issue until *after* the parties had presented all of the evidence favorable to their respective positions, we are compelled to presume that both parties adduced all of the evidence that they believed the jury needed to know about the issue of prejudice or lack thereof. Thus, for purposes of determining whether the trial court's failure to instruct the jury on late notice was prejudicial to Hartford, we must examine the record to ascertain whether the evidence of prejudice was sufficient to support the conclusion that, if the court had instructed the jury on Hartford's notice defense, the verdict most likely would have been different because the jury would have concluded that National had not rebutted the presumption of prejudice. As I have explained, however, the only evidence adduced on the issue indicates that Hartford was not prejudiced by the notice that it received from National.

The majority ignores this critical aspect of the record. Instead, its opinion is devoted almost entirely to establishing why, because of National's alleged delay in providing notice, the trial court improperly failed to instruct the jury on Hartford's claim of untimely notice. As I have indicated, I agree that the court should have given the requested instruction. In focusing solely on the alleged delay, however, the majority fails to address meaningfully the key issue in the case, namely, whether Hartford has demonstrated that it is entitled to a new trial because of that instructional impropriety.[17] Indeed, the majority's analysis of that question begins and ends with its conclusory assertion that National's burden of proving the absence of material prejudice would have been difficult to meet. One searches the majority opinion in vain for any evidence supporting this assertion.

---

[17] Of course, delay alone is not evidence of prejudice.

Ultimately, the majority's conclusion is wholly unpersuasive because it disregards the facts in the record. Since the only evidence pertaining to the issue of prejudice indicates that there was none, and because the trial record otherwise is devoid of evidence from which an inference of prejudice might be drawn, it is highly implausible that a properly instructed jury would have found that National had failed to satisfy its burden of demonstrating a lack of material prejudice. Put differently, there simply is no reason to believe that, in such circumstances, the jury would have found that National, which otherwise was entitled to invoke the protections of the policy for which it had made regular premium payments, had forfeited its rights under the policy because it had not adduced *enough* evidence to establish that Hartford was not materially prejudiced by the notice that it received. I do not see why we would presume that the jury would come to such a conclusion when, after weeks of testimony and evidence, the record revealed not a hint of prejudice, material or otherwise. Indeed, the majority's conclusion is even less supportable in view of the jury's express finding that National had cooperated with Hartford in accordance with policy requirements.[18]

---

[18] In support of its claim that the outcome of the trial would have been different because of the likelihood that the jury would have found that National had not met its burden of persuading the jury of a lack of material prejudice, Hartford suggests several scenarios pursuant to which it conceivably might have been able to mitigate National's losses if it had received earlier notice of those losses. For example, Hartford posits that Ashayeri, its computer consultant, or some other expert retained by Hartford, possibly might have been able to solve National's systemic computer problem, thereby permitting National to maintain its business operations, if Hartford had been given more prompt notice of the problem. Hartford acknowledges, however, that there is nothing in the record to indicate whether Ashayeri or anyone else could have succeeded in such an endeavor. Because the scenarios posed by Hartford are speculative and find no support in the record, I, like the majority, see no reason to elaborate further on them. Suffice it to say that there is no reasonable possibility that the jury would have been persuaded by Hartford's hypothetical theories of potential prejudice because those theories are disconnected from the evidence. See *Coughlin* v. *Anderson*, 270

In sum, I fully agree with the Appellate Court that Hartford has failed to demonstrate that the outcome of the trial would have been different if the trial court had instructed the jury on its claim of late notice. The majority's contrary conclusion is belied by the record, which contains no evidence even to suggest that Hartford was prejudiced by the arguably late notice that it received. In view of that record, it is extremely unlikely that a jury properly instructed on Hartford's defense of late notice nevertheless would have found that National had forfeited its payment rights under the policy because it did not adduce more evidence of the lack of prejudice. Accordingly, I respectfully dissent.

Conn. 487, 497–98, 853 A.2d 460 (2004) ("[a]lthough it is the jury's right to draw logical deductions and make reasonable inferences from the facts proven . . . it may not resort to mere conjecture and speculation" [internal quotation marks omitted]).