******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# RICHARD HOPE ET AL. *v.* WILLIMANTIC PARTNERS, LLC, ET AL.
# (AC 46499)

Moll, Seeley and Flynn, Js.

### *Syllabus*

The defendant appealed from the trial court's judgment, rendered after a jury trial, for the plaintiffs, H and O, who had alleged that they were injured when H slipped and fell on top of O in a parking lot owned by the defendant. H died prior to trial, and a video recorded statement by H was admitted as a full exhibit at trial pursuant to the dead man's statute (§ 52-172). The jury first returned a verdict for the plaintiffs, finding them each 70 percent negligent and the defendant 30 percent negligent. After the court reinstructed the jury regarding comparative negligence, the jury found the defendant 100 percent negligent as to both plaintiffs and awarded each plaintiff the same amounts as in the first verdict. On appeal, the defendant claimed, inter alia, that the court improperly denied its motion for judgment notwithstanding the verdict because there was insufficient evidence that a defect existed where H fell and that the defendant had actual or constructive knowledge of a specific defect on the premises. *Held*:

The trial court properly denied the defendant's motion for judgment notwithstanding the verdict, as there was sufficient evidence from which the jury reasonably could have found the location of the defect in the parking lot, that the defect existed in the place where H fell, and that the defendant knew or should have known of that specific defect.

The trial court properly declined to give the defendant's requested jury charge limiting the use of H's video statement to H's claims only, as neither the text of § 52-172 nor case law warranted an exception to the admissibility of evidence under that statute disallowing its use as to O's claims.

The trial court properly denied the defendant's motion to set aside the verdict claiming that the jury, on reconsideration of its initial verdict pursuant to statute (§ 52-223), disregarded the law and the court's instructions, as a jury, on reconsideration, can change its verdict as to both liability and damages and nothing in the record indicated that the jury disregarded the law or the court's reinstruction on comparative negligence.

The trial court properly declined to charge the jury on spoliation of evidence with respect to the destruction of an engagement letter in a physical file that had been maintained by the plaintiffs' expert, as the charge was not reasonably supported by the evidence.

Argued September 8, 2025—officially released January 13, 2026

*Procedural History*

Action to recover damages for personal injuries sustained as a result of the defendants' alleged negligence, and for other relief, brought to the Superior Court in the judicial district of Hartford, where the administrators and fiduciaries of the named plaintiff's estate were substituted for the named plaintiff; thereafter, the court, *Rosen, J.*, granted the motion for summary judgment filed by the defendants Liberty Bank Mortgage Company et al.; subsequently, the court, *Budzik, J.*, denied the named defendant's motion in limine to preclude certain evidence; thereafter, the case was tried to the jury before *Cobb, J.*; verdict for the plaintiffs; subsequently, the court, *Cobb, J.*, denied the named defendant's motion to set aside the verdict and for judgment notwithstanding the verdict and rendered judgment for the plaintiffs, from which the named defendant appealed to this court. *Affirmed*.

*Wesley W. Horton*, with whom were *Michael A. Lanza* and *Jonathan P. Ciottone* and, on the brief, *Richard E. Fennelly III* and *Mei-wa Cheng*, for the appellant (named defendant).

*James J. Healy*, with whom were *Allison D. White* and *Frank McCoy*, for the appellees (plaintiffs).

*Opinion*

FLYNN, J. In this premises liability action, the defendant Willimantic Partners, LLC,[1] appeals from the judgment of the trial court, rendered after a jury trial, in favor of the plaintiffs, Richard Hope and his daughter, Deborah Oliver, after they sustained injuries following

---

[1] The complaint also named as defendants Liberty Bank Mortgage Company and Liberty Bank Foundation, Inc. (Liberty Bank defendants). The Liberty Bank defendants filed a motion for summary judgment, which the court granted. The court then severed the indemnification claims that the Liberty Bank defendants and Willimantic Partners, LLC, brought against each other. The Liberty Bank defendants did not participate in this appeal. Accordingly, we will refer in this opinion to Willimantic Partners, LLC, as the defendant.

a fall on property owned by the defendant and leased to Liberty Bank. On appeal, the defendant claims that the court improperly (1) denied its motion for judgment notwithstanding the verdict because there was insufficient evidence that a defect existed where Hope fell and that the defendant had actual or constructive knowledge of a specific defect on the premises, (2) admitted Hope's statements under the dead man's statute, General Statutes § 52-172, without limitation at trial despite the fact that Oliver is a living party, (3) denied its motion to set aside the verdict despite that the jury acted improperly by disregarding the law and the court's instructions on comparative negligence, and (4) declined to charge the jury on spoliation of the evidence. We affirm the judgment of the trial court.

For the reasons that follow, we conclude that the trial court (1) properly denied the defendant's motion for judgment notwithstanding the verdict because there was sufficient evidence that Hope fell at a spot in a parking lot containing an uneven depressed linear defect of which the defendant had at least constructive notice; (2) correctly applied § 52-172 when it rejected the defendant's requested charge limiting use of Hope's video statement to only Hope's claims because neither the text of § 52-172 nor case law warrant this court drawing an exception to the admissibility of evidence under that statute disallowing its use as to Oliver's claims; (3) properly exercised its discretion in accepting the jury's second verdict because, on reconsideration, a jury can change its verdict both as to liability and damages; and (4) did not improperly decline to charge the jury on spoliation because the charge was not reasonably supported by the evidence.

At trial, the jury was presented with evidence of the following relevant facts. On January 19, 2016, Hope and Oliver went to Liberty Bank in Willimantic, which property the defendant owned. Because there was a car in the handicap parking space, Hope parked two spots over from that space. As he exited the bank to return to his car, Hope stepped down from the curb on the sidewalk

onto the paved parking lot, placed his hand on the hood of the car, walked one or two steps toward his car, and fell in a pothole, landing on top of Oliver, who was walking next to him. The pothole was located in an uneven linear depression in the pavement that ran the length of the parking lot and ran only a couple of steps from the sidewalk.

Prior to the fall, Hope, who used a cane or walker to ambulate, was a "very independent" eighty-seven year old who lived alone, volunteered in the community, frequented restaurants, attended family parties, and went to church. As a result of the fall, Hope suffered a partially severed spinal cord that caused paralysis in three limbs, was unable to speak normally, lost his connection with the outside world, suffered incontinence, and never returned home. He died in 2019, prior to trial.

Prior to the fall, Oliver, who had been diagnosed with schizoaffective disorder in her early twenties, also was "very independent." Despite her diagnosis, she worked as a cashier at Stop & Shop for approximately twenty-five years, paid her own bills independently, had a routine with Hope and another family member "where they would go out frequently, whether that be go out to eat, to go out to church," and was "a real extrovert" who "liked to interact with all the people." As a result of the fall, Oliver broke her right femur in two places and used a walker. She was no longer able to work, was more dependent, and experienced a marked decline in her mental health. Oliver did not testify at trial.

A premises liability action was initiated against the defendant by Oliver and Hope. The administrators and fiduciaries of the estate of Richard Hope (collectively, Hope's estate) were substituted as plaintiffs for Hope after his death. In the operative amended complaint, the plaintiffs sought damages for personal injuries sustained when they fell on the defendant's Liberty Bank property. In its answer, the defendant asserted the special defense of comparative negligence as to each plaintiff. A jury trial was held over five days in February, 2023.

At the close of the plaintiffs' case, the defendant filed motions for a directed verdict as to the counts alleged by both Hope's estate and Oliver. The court denied these motions. The jury first returned a verdict in favor of the plaintiffs while finding them each 70 percent negligent and the defendant 30 percent negligent. The court advised counsel of the issue this verdict presented. After the court reinstructed the jury regarding comparative negligence and read the pertinent portion of the original charge, and following additional deliberation, the jury found the defendant 100 percent negligent as to both plaintiffs and awarded Oliver a total award of $318,900 and Hope's estate a total award of $1,125,900. The court accepted the verdict as to both plaintiffs. The defendant filed a motion to set aside the verdict and for judgment notwithstanding the verdict, which the court denied. This appeal followed.[2]

## I

The defendant first claims that the court improperly denied its motion for judgment notwithstanding the verdict because there was insufficient evidence that a defect existed where Hope fell and that the defendant had actual or constructive knowledge of that specific defect on the premises. We are not persuaded.

We begin our analysis with the standard of review. "The standard of review governing a motion for judgment notwithstanding the verdict is the same [as a motion for a directed verdict] because a motion for judgment notwithstanding the verdict is not a new motion, but the renewal of a motion for a directed verdict." (Internal quotation marks omitted.) *Haynes* v. *Middletown*, 314 Conn. 303,

---

[2] In its appeal form, the defendant indicates that it is appealing from the court's judgment in favor of the plaintiffs and the court's denial of its motion to set aside the verdict and judgment notwithstanding the verdict, motion for a mistrial, motion for remittitur, motion in limine, request to charge, and motion for summary judgment. In its appellate brief, the defendant challenges the court's denial of its motion to set aside the verdict and for judgment notwithstanding the verdict and the denial of requested charges. We deem the decisions of the court listed on the appeal form but not briefed to be abandoned.

312, 101 A.3d 249 (2014). "The legal question raised by a motion for a directed verdict challenging the legal sufficiency of the evidence, and by a motion for judgment notwithstanding the verdict raising those same grounds, is not the sufficiency of the plaintiff's proof alone; it is whether [a] directed verdict is justified [because] on the evidence the jury reasonably and legally could not have reached any other conclusion." (Internal quotation marks omitted.) *Riley* v. *Travelers Home & Marine Ins. Co.*, 333 Conn. 60, 81–82, 214 A.3d 345 (2019). "Whether the evidence presented by the plaintiff was sufficient to withstand a motion for a directed verdict is a question of law, over which our review is plenary." *Curran* v. *Kroll*, 303 Conn. 845, 855, 37 A.3d 700 (2012).

"[O]ur review of a trial court's refusal to direct a verdict or to render a judgment notwithstanding the verdict takes place within carefully defined parameters. We must consider the evidence, including reasonable inferences which may be drawn therefrom, in the light most favorable to the parties who were successful at trial . . . giving particular weight to the concurrence of the judgments of the judge and the jury, who saw the witnesses and heard the testimony . . . . The verdict will be set aside and judgment directed only if we find that the jury could not reasonably and legally have reached their conclusion." (Internal quotation marks omitted.) *Riley* v. *Travelers Home & Marine Ins. Co.*, supra, 333 Conn. 70–71.

In its motion for judgment notwithstanding the verdict, the defendant argued that no evidence was presented at trial that it had actual or constructive knowledge of the defect. In denying the motion, the court reasoned "that, as to both plaintiffs, there was sufficient evidence on which the jury might have reasonably reached its conclusion, including testimony, photographs, expert testimony, and other exhibits . . . ."

"[T]o succeed in a traditional negligence action that is based on premises liability, the plaintiff must prove (1) the existence of a defect, (2) that the defendant knew

or in the exercise of reasonable care should have known about the defect and **(3)** that such defect had existed for such a length of time that the [defendant] should, in the exercise of reasonable care, have discovered it in time to remedy it." (Internal quotation marks omitted.) *Hill* v. *OSJ of Bloomfield, LLC*, 200 Conn. App. 149, 154–55, 239 A.3d 345 (2020).

"[F]or the plaintiff to recover for the breach of a duty owed to [him] as [a business] invitee, it [is] incumbent upon [him] to allege and prove that the defendant either had actual notice of the presence of the specific unsafe condition which caused [his injury] or constructive notice of it. . . . [T]he notice, whether actual or constructive, must be notice of the very defect which occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it." (Internal quotation marks omitted.) *Baptiste* v. *Better Val-U Supermarket, Inc.*, 262 Conn. 135, 140, 811 A.2d 687 (2002). Such notice must be of the "very defect" that occasioned the injury. (Internal quotation marks omitted.) *DiPietro* v. *Farmington Sports Arena, LLC*, 306 Conn. 107, 117, 49 A.3d 951 (2012). Accordingly, business owners do not breach their duty to invitees by failing to remedy a defect unless they had actual or constructive notice of such defect. Id.

In the present case, there was sufficient evidence from which the jury reasonably could have found, on the basis of the evidence presented and the reasonable inferences that could be drawn therefrom, the location of the defect in the parking lot, that the defect existed in the spot where Hope fell, and that the defendant knew or should have known of that specific defect.

Specifically, evidence of the existence of a defect in the Liberty Bank parking lot came from photographic evidence and testimony from the plaintiffs' expert. Plaintiffs' exhibit 2, which was admitted as a full exhibit, depicted the Liberty Bank parking lot with a single row of parking spaces that abutted a sidewalk. Running lengthwise next to the sidewalk adjoining an unbroken paved

strip was an uneven linear depression in the asphalt. White lines delineating parking spaces were painted over the linear depression.

Evidence that the defect was an uneven linear depression in the pavement that had existed long enough for white parking lines to be painted over it came from the testimony of Mark Tebbets, the plaintiffs' expert in Connecticut's building code, who opined that the defect had resulted from an excavation that had not been properly compacted.[3] Specifically, Tebbets testified that "the walking surface adjacent to this sidewalk was in terrible condition. There was a big hump in it and there were depressions all over, so it was very unsafe walking surface. Anything with a hump like that creates a problem for people walking through it" and that it "looks like somebody has dug a trench through there for some reason and not done a very good job of compacting and finishing it off when they were done. It also shows a number of depressions in the asphalt where cars park. Cars have hot—warm tires when they pull in and the warm tires have a tendency to push the asphalt out, so some depressions have been pushed into the asphalt. And it's very uneven walking surface." He further testified that "you can see the hump of the—of the asphalt, and you can see it's been that way for a while because they've actually painted the lines over the top of it, but it is humped and you can also see the depressions. Excuse me. There's some rainwater in them right now, so you can really see the size and location of those depressions." He further elaborated that "[y]ou can see a depression where the car tires would normally be, but it also extends over towards the white line. The white line pretty much represents

_____

[3] Tebbets had the following expert credentials: he has a bachelor's degree in education from Rhode Island College; was an industrial arts teacher who taught woodshop, metal shop, and electronics; worked in construction; and he worked for the town of Groton for eleven years, first as an assistant building official for the town of Groton before being promoted to building official, zoning enforcement officer, and housing code official, during which time he took the necessary tests to become a "building code official, and then a master code official they called it [back] the[n]; now they call it a master code professional, which is the highest certification they give."

the area that if you're getting in and out of the vehicle you would walk down. And you can see the broken and deteriorated condition of that patch that they've put over it, and it actually humps up at that point."

Statements from Hope and testimony from Hope's relatives detailed the spot in the parking lot where Hope fell. Specifically, Hope's other daughter, Kathleen Haggerty, testified that, according to her conversations with Hope following the incident, during which time she showed him photos of the Liberty Bank parking lot, Hope explained to her that he did not park in the handicap parking spot " '[c]ause there was a car there," but parked "two over from the handicapped [parking spot]." Plaintiffs' exhibit 2 depicted the Liberty Bank parking lot with a pile of snow at the far end of a single row of parking spaces that abutted a sidewalk. Haggerty testified as follows concerning plaintiffs' exhibit 2 and her conversations with Hope:

"Q. Can you identify which parking spot they were in based on what [Hope] told you?

"A. Yes. . . .

"Q. Okay. Is there a picture there that you can identify the parking spot they were in based on what he told you when they fell?

"A. Yes.

"Q. And which number is that?

"A. That is number 2.

"Q. Okay. Can we look at number 2? And can you point out which parking spot that is?

"A. It's the third from the—it's the third from the snow.

"Q. And how do you know that?

"A. Because he said so.

"Q. Okay. So, it's—maybe I'll take that laser pointer. Sorry. So, one, two, three; would that be the parking spot?

"A. Yes."

Prior to his death, Hope made a video statement concerning the incident in the Liberty Bank parking lot, which was admitted as a full exhibit at trial under the dead man's statute, §52-172. Specifically, when asked on the video about the cause of the fall, Hope explained: "I went to the bank. We cashed my checks. Every . . . Monday I'd go up. When we came out of the bank, we were parked on the side of the curb, so I went to the curb, I held on, the car was there, so I held onto the car, got off the curb, got down to the flat surface, and then my daughter was right beside me with the walker, behind me, and I ran my fingers along the car to be secure and then all of a sudden I took approximately one or two steps, I slipped and fell over, hit my daughter's knee and broke a bone . . . two bones in the knees, then I came down and I hit my head on the tar." Additionally, Hope indicated that he had seen pictures of the pothole or depressions in the Liberty Bank parking lot, and, when asked whether that pothole or depression in the parking lot was what caused him to fall, he responded, "that would have been it . . . ."

James Oliver,[4] Oliver's son, testified that his grandfather, Hope, told him about the incident at Liberty Bank. Specifically, James Oliver testified that Hope "stepped on the curb to step down into the parking lot, [and] he put his hand on the hood of the car. As he walked in the parking lot, he fell in a pothole on top of [Oliver], and then he ended up hitting his head on the tar."

Despite this evidence, the defendant contends that "there were no eyewitnesses to the incident, nor was there any security footage. Plaintiffs' expert could not identify a specific defect in the parking lot. Ms. Oliver did not testify at trial, and prior statements she made were not admitted into evidence. Thus, the only evidence

---

[4] We will refer in this opinion to Deborah Oliver as Oliver and to her son, James Oliver, by his first and last names.

concerning the incident came from the mouth of Richard Hope. But Mr. Hope said nothing to either Ms. Haggerty or his grandson or in his video as to the specific defect that caused the fall." The defendant further argues that, "[e]ven in response to leading questions, Mr. Hope did not identify a specific defect himself in his video. He did not know the specific spot where he fell, and he did not even know which side of the car he got out of to go to the bank, or state which side of the car he was on when he fell. Rather, he said that he stepped off the curb onto a flat surface."

We first observe that neither eyewitness testimony nor security footage was necessary. There was ample evidence from which the jury reasonably could have concluded that the plaintiffs fell as a result of a specific defect in the Liberty Bank parking lot. Although the defendant also highlights the lack, in some respects, of direct evidence, we note that evidence "comes in two forms, direct and circumstantial. The basic distinction between direct and circumstantial evidence is that in the former instance the witnesses testify directly of their own knowledge as to the main facts to be proved, while in the latter case proof is given of facts and circumstances from which the jury may infer other connected facts which reasonably follow, according to common experience. . . . Proof of a fact by the use of circumstantial evidence usually involves a two-step process. A fact is first established by direct evidence, which is ordinarily eyewitness or other direct testimony. That direct evidence can serve as a basis from which the jury infers another fact. Thus, the direct evidence may operate as circumstantial evidence from which a fact is inferred by the jury. . . . When the necessity to resort to circumstantial evidence arises either from the nature of the inquiry or the failure of direct proof, considerable latitude is allowed in its reception." (Citations omitted; internal quotation marks omitted.) *Curran* v. *Kroll*, 118 Conn. App. 401, 409, 984 A.2d 763 (2009), aff'd, 303 Conn. 845, 37 A.3d 700 (2012).

Although the jury would have had to have made reasonable inferences in reaching the verdict, "[t]here is no

distinction between direct and circumstantial evidence [so] far as probative force is concerned . . . . In fact, circumstantial evidence may be more certain, satisfying and persuasive than direct evidence." (Internal quotation marks omitted.) Id., 408. The trier of fact may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical and may also draw factual inferences on the basis of already inferred facts. *State* v. *Rhodes*, 335 Conn. 226, 237–38, 249 A.3d 683 (2020). When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion; if that correlation is sufficiently compelling, the inference is reasonable, but at some point the link between the facts and the conclusion becomes so tenuous that we call it speculation. Id., 238.

First, from Hope's statement, the testimony of Hope's relatives, the expert testimony of Tebbets, and from the photographic evidence of the Liberty Bank parking lot, the jury reasonably could have inferred that the spot where Hope fell was the pothole in the linear depression depicted in the plaintiffs' photographic evidence marked as plaintiffs' exhibit 2. Hope's statement provided the jury with a description of his fall.[5] He stated that his car was parked "on the side of the curb" and that he "held onto the car, got off the curb, got down to the flat surface . . . ran [his] fingers along the car to be secure and then all of a sudden [he] took approximately one or two steps, [and he] slipped and fell over . . . ." The jury could have matched Hope's statement with Haggerty's identification of the spot in which Hope parked as being "the third from the snow" as depicted in plaintiffs' exhibit 2. As shown on plaintiffs' exhibit 2, the uneven linear defect

[5] The defendant's argument that Hope was asked some leading questions in his video recorded statement is without merit. The statement was admitted as a full exhibit, and it was within the province of the jury to decide the weight to give that statement. See, e.g., *Rickert* v. *Fraser*, 152 Conn. 678, 681, 211 A.2d 702 (1965) ("[t]he credibility of witnesses and the weight to be accorded to their testimony lie within the province of the jury").

where Hope fell, which was sometimes referred to as a "pothole," ran directly parallel to and up against the sidewalk and extended the length of the parking area, including the spot that was the third from the snow. The exhibit depicted a pile of snow running perpendicular to the far end of the sidewalk and multiple parking spaces abutting the sidewalk. Tebbets described the asphalt near the sidewalk as being "in terrible condition," with "depressions all over," creating "a problem for people walking through it."

Based on Hope's statement that he was returning to the car when he fell, James Oliver's testimony that Hope told him that, as he stepped off the sidewalk, he put his hand on the hood of the car, and Haggerty's testimony that Hope had parked the car in the third spot from the snow, the jury reasonably could have inferred that Hope drove to the bank, parked the car facing the sidewalk, and, after leaving the bank, returned to the driver's side of that parking spot. In his statement, Hope identified the spot where he fell as being one or two steps from the curb. From Hope's description, plaintiffs' exhibit 2 depicting the width of the linear defect in relation to the white lines delineating the size of the parking space, and Tebbets' description of the defect as being where car tires would normally be and extending toward the white line that represents "the area that if you're getting in and out of the vehicle you would walk down," the jury also reasonably could have inferred that the uneven linear depression depicted in plaintiffs' exhibit 2 was one or two steps in width. As stated in Hope's own words, the depression in the Liberty Bank parking lot "would have been it" when describing the location of his fall.

Accordingly, construing the evidence in the light most favorable to sustaining the verdict and asking whether the totality of the evidence and reasonable inferences support the jury's verdict; *Riley* v. *Travelers Home & Marine Ins. Co.*, supra, 333 Conn. 70–71; we conclude that the jury reasonably could have inferred that, more likely than not, Hope fell one or two steps from

the sidewalk in front of the parking space that was "the third from the snow," in which location there existed an uneven linear depression. Although it is also reasonable that the jury could have reached different inferences from those supporting the verdict, proof of a material fact by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis. *State* v. *Rhodes*, supra, 335 Conn. 238. Significantly, unlike Aristotelian and Thomistic logic, the law does not demand metaphysical certainty in its proofs. Rather, the preponderance of the evidence, applied to civil claims generally, requires that proof be more probable than not and does not require absolute certainty. *Curran* v. *Kroll*, supra, 118 Conn. App. 408.

Second, there was sufficient evidence from which the jury reasonably could have found that the defendant knew or should have known of the specific defect where Hope fell. The controlling question in deciding whether a defendant had constructive notice of a defective condition is whether that condition had existed for such a length of time that the defendant should, in the exercise of reasonable care, have discovered it in time to remedy it, and the determination of what constitutes a reasonable length of time is largely a question of fact to be determined in the light of the particular circumstances of a case. See *Riccio* v. *Harbour Village Condominium Assn., Inc.*, 281 Conn. 160, 163–64, 914 A.2d 529 (2007). Plaintiffs' exhibit 2 shows the white lines that delineate parking spaces that had been painted in the parking lot, including over the uneven linear defect, the lines bounding the parking space that was the third from the snow in which the plaintiffs fell. Additionally, Tebbets testified, concerning the condition of the parking lot as containing the uneven linear depression and resulting hump in the asphalt, that it has "been that way for a while because they've actually painted the lines over the top of it . . . ." On the basis of the evidence that the white parking lines had been painted over the defect, there was sufficient evidence from which the jury reasonably could have determined that the defect had existed long enough prior

to Hope's fall so that the defendant knew or should have known that the defect existed on its property.

For the foregoing reasons, we reject the defendant's contention that there was insufficient evidence both of a specific defect and actual or constructive knowledge of that specific defect on the premises. Because the jury could have reasonably and logically reached its conclusion, the defendant cannot prevail on its evidentiary insufficiency argument. See, e.g., *Riley* v. *Travelers Home & Marine Ins. Co.*, supra, 333 Conn. 81–82 (directed verdict is justified only when jury could not have reasonably and legally reached its conclusion). We, therefore, conclude that the court properly denied the defendant's motion for judgment notwithstanding the verdict.

## II

The defendant's next claim concerns a video statement made by Hope prior to his death, which the court admitted as a full exhibit at trial, without objection, under the dead man's statute, § 52-172. The defendant argues that, as a matter of statutory construction, the court erred in applying § 52-172 to allow the jury to consider Hope's video statement as evidence to support Oliver's claims. Specifically, the defendant contends that the court misapplied § 52-172 when it rejected its requested charge limiting use of the video evidence to Hope's claims only. We disagree.

The following additional procedural background is relevant. The defendant filed a motion in limine seeking to exclude "any witness from testifying concerning the facts, circumstance[s] and cause of the subject fall as it pertains to Deborah Oliver . . . [and] this should include any statement by Richard Hope as contained in the video statement as to the cause of Deborah Oliver's fall." The court reserved its decision on that motion, and, at trial, the court admitted into evidence Hope's video recorded statement as a full exhibit, without objection. The defendant's counsel requested that the court charge the jury

that it "cannot consider the statements of Richard Hope in connection with the claims of Deborah Oliver." In declining to give the requested instruction, the court reasoned that "I don't think [the statute] goes as far as to say that the jury can't consider those statements as to another party. Once it's in as evidence, it's evidence."

We note that a relevant charge must be given if it is reasonably supported by the evidence and constitutes an accurate statement of the law. *National Publishing Co.* v. *Hartford Fire Ins. Co.*, 287 Conn. 664, 671, 949 A.2d 1203 (2008). In reviewing the issue before us, we focus on whether it would constitute an accurate statement of the law that Hope's statements were limited to the counts of the complaint alleged by Hope's estate.[6] This presents a question of statutory interpretation over which we exercise plenary review. See *Tomick* v. *United Parcel Service, Inc.*, 324 Conn. 470, 477, 153 A.3d 615 (2016). When construing a statute, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of the case, including the question of whether the language actually

---

[6] The plaintiffs argue in their appellate brief that the defendant's claim concerning the interpretation of the dead man's statute cannot be reviewed because the defendant seeks to raise an evidentiary or instructional argument through a motion for a directed verdict, never identified nor appealed from any evidentiary ruling, never advanced an objection to the introduction of the dead man's evidence, never sought a limiting instruction prior to the evidence being admitted below, and never purported to challenge any such ruling when it appealed. The court reserved its decision on the defendant's motion in limine, which sought to preclude from admission into evidence any statements by Hope as to Oliver's claims. The defendant did not renew the objection or seek a limitation on its use when evidence from Hope was introduced into the entire action under the dead man's statute. At the charging conference, however, the defendant requested that the court give the jury the limiting instruction that Hope's video recorded statement could not be used as to Oliver's claims. We take the plaintiffs' point that the trial judge was never alerted during trial that it continued to be an issue in the case until the request to charge at the charging conference at the end of the evidentiary portion of the case. The court declined to give that charge requested by the defendant. In light of this charge request, which complicates the issue of preservation for appeal, we proceed to decide the issue on the merits and determine it is without merit.

does apply. Id. If the meaning of the text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. General Statutes § 1-2z.

Section 52-172 provides in relevant part that, "[i]n actions by or against the representatives of deceased persons, and by or against the beneficiaries of any life or accident insurance policy insuring a person who is deceased at the time of the trial, the entries, memoranda and declarations of the deceased, relevant to the matter in issue, may be received as evidence. . . ."

"The legislature's purpose in enacting the dead man's statute was to remove the disparity in advantage previously possessed by living litigants as against the representatives of persons whose voices were stilled by death, by permitting the declarations and memoranda of the latter to be received and weighed in the evidential balance as against the assertions of the living. . . . The statute is remedial and construed liberally, generally admitting statements of decedents in actions by or against their representatives." (Citations omitted; internal quotation marks omitted.) *Dinan* v. *Marchand*, 279 Conn. 558, 574, 903 A.2d 201 (2006).

The defendant contends that "[t]here is no doubt that, if Ms. Oliver had sued separately, Mr. Hope's statement would not have been admissible in her suit. The outcome should be no different just because Ms. Oliver's action was joined with Mr. Hope's. If the contrary were true, the statute would read 'in actions involving the representatives of deceased persons' rather than 'in actions by or against the representatives of deceased persons.' " (Emphasis omitted.) The plaintiffs counterargue that "[t]his joint 'action' was brought by Mr. Hope (and, thereafter, his representatives) as well as Ms. Oliver. The statutory language clearly applied to this case. Although the defendant would read it out of the statute,

the statutory term 'actions' has been interpreted and applied broadly for more than a century."

According to the plain text of § 52-172, relevant declarations of the deceased may be received as evidence in "*actions* by . . . the representatives of deceased persons . . . ." (Emphasis added.) In interpreting the statute, every word and phrase is presumed to have meaning, and we do not construe statutes so as to render certain words and phrases surplusage. *Ugrin* v. *Cheshire*, 307 Conn. 364, 383, 54 A.3d 532 (2012). "In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly." General Statutes § 1-1 (a).

Our Supreme Court, in interpreting the word "action" as used in a prior version of the dead man's statute, which preceded the 1949 codification of § 52-172, provided that relevant declarations of deceased persons may be received as evidence "in actions by or against the representatives of deceased persons," stated: "We find, in the first place, that the remedy is confined to what are designated as 'actions.' This is a word which has been employed in a strict technical sense, but we have repeatedly said of it when used, as here, in statutes regulating judicial procedure, that it might well be used in a more general and comprehensive sense, embracing all proceedings in a court of justice for the purpose of obtaining such redress as the law provides." *Mulcahy* v. *Mulcahy,* 84 Conn. 659, 663, 81 A. 242 (1911).

Before addressing the statutory requirements, we emphasize that both Hope and Oliver were parties to the action and that the claim of error relates to Oliver's claims only. The requirement specified in § 52-172 for the admissibility into evidence of statements by a deceased person is simply that the statement be relevant to the matter at issue and that it be in an "action" by or against the representatives of the deceased person. The

defendant's argument that the word "by" in the statute somehow limits the use of statements by deceased persons to only claims raised by their representatives is not convincing. It is axiomatic that there can be more than one plaintiff in the same action. It is significant that the statute does not limit the use of statements by deceased persons to claims made by their representatives but permits the admission of such statements in *actions* by the representatives of the deceased.

Hope's video recorded statement satisfies the requirements of § 52-172 for admissibility in the entire premises liability action brought by Oliver and Hope; representatives of Hope's estate were later substituted for Hope. Accordingly, because Hope's statement was admissible in the premises liability action and because § 52-172 does not limit its use to only Hope's claims, the court properly declined to give the limiting instruction requested by the defendant.[7]

### III

The defendant next claims that the court improperly denied its motion to set aside the verdict because the jury, on reconsideration of its initial verdict, disregarded the law and the court's instructions. Again, we disagree.

"In reviewing a trial court's action on a motion to set aside a verdict, the question is whether the trial court clearly abused its discretion. . . . Although the trial court's decision in this regard is entitled to great weight . . . where it is clear that the jury could not reasonably and logically have reached the conclusion they did, the court's refusal to set aside the verdict rendered will not

[7] We note, additionally, a treatise on Connecticut evidence states that "[e]vidence is not owned by the party offering it" but, rather, evidence "can be used by any party for any purpose unless otherwise limited when admitted." E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 1.19.5, p. 76.

be sustained." (Citations omitted.) *Labatt* v. *Grunewald*, 182 Conn. 236, 240–41, 438 A.2d 85 (1980).

The following additional facts are relevant to this claim. Following deliberations, the jury informed the court that it had reached a verdict. The jury found in favor of Oliver, awarding $63,000 in economic damages and $1 million in noneconomic damages, and found the defendant 30 percent negligent and Oliver 70 percent negligent, for a total damages award of $318,900. The jury's initial verdict as to Hope was not read aloud in court, but the jury form indicated that the jury found in favor of Hope, awarding him $3 million in noneconomic damages and $753,000 in economic damages, while finding him 70 percent negligent, for a total award of $1,125,900.

Outside the presence of the jury, the court stated, "we have a problem, and the problem is that the percentage attributable to the defendant is 30 percent and the percentage attributable to the plaintiff is 70 percent, which means a defendant's verdict." Following a conference with counsel off the record, the court reinstructed the jury regarding comparative negligence. Specifically, the court stated: "As I have explained, the plaintiffs claim that . . . their injuries were caused by the defendant's negligence, and the defendant claims that they were caused by the plaintiffs' own negligence. If you find the negligence on the part of all parties was a substantial factor in causing [the] plaintiffs' injur[ies], then the law is that the plaintiff can recover from the defendant only to the extent of the defendant's fault and may not recover damages to the extent that he himself was at fault—or they were at fault. If the plaintiffs were more at fault than the defendant, then the plaintiffs cannot recover damages. . . . So, what I'm going to ask you to do is to take a look at this, talk to each other, figure out what it is you intended to do. If your intention is that the defendant was 30 percent at fault and the plaintiff was 70 percent at fault, you need to fill out the other forms for defendant's verdict. If your intention is something else, you need to

fix this form. Do you understand? Okay. Do you think you can do this very quickly?"[8] Following additional deliberation, the jury returned a verdict in favor of Oliver and against the defendant as follows: economic damages of $63,000 and noneconomic damages of $255,900, with the defendant 100 percent negligent and Oliver 0 percent negligent, for a total damage award of $318,900. The jury also returned a verdict in favor of Hope and against the defendant as follows: economic damages of $753,000 and noneconomic damages of $372,900, with the defendant 100 percent negligent and Hope 0 percent negligent, for a total damage award of $1,125,900. The court accepted the verdict as to both plaintiffs.

In its motion to set aside the verdict, the defendant argued that the court's reinstruction on comparative negligence was improper as it should have recharged the jury regarding damages and that the jury was confused by the court's instructions because it changed the percentage of negligence attributable to each party as well as the damage award. The defendant also argued that the jury disregarded the law and the court's instructions.

On appeal, the defendant argues that, in awarding the plaintiffs the same total damage award as it did in its initial verdict while altering the percentage of negligence attributable to the parties, "the jury disregarded the law and gave the plaintiffs the sums previously agreed on. That is the only logical way to read what the jury did." (Emphasis omitted.)

We conclude that the court was within its discretion in accepting the jury's second verdict. "The supervision which a presiding judge has over a verdict which may be

---

[8] The defendant also contends that "[t]he court encouraged [the jurors] to make a quick decision and they did. Indeed, in the ears of impressionable jurors, the court's language—'Do you think you can do this very quickly?'—may have sounded tantamount to an order." We do not characterize the court's language that way. The court day was waning and trial courts sometimes, if not often, take note of this because if the jury could not come back with a second verdict quickly, then common sense would dictate that that day's proceedings would need to end for that day and that the proceeding be continued on the next court date.

rendered is an essential part of the jury system, and that supervision tends to make jurors more careful in reaching their conclusions. . . . The control of the court over the verdict of the jury is limited but salutary. . . . General Statutes § 52-223,[9] which permits the court to return a jury to consider their verdict, appropriately employed, is a salutary and effective method of exercising judicial supervision over a verdict which may be rendered by a jury. The practice of returning the jury for further consideration has been followed since *Russell* v. *Bradley,* 4 Day [Conn.] 403, 406 [1810], by the authority of § 52-223 and its predecessors. . . . The exercise of the court's power under § 52-223 in returning the jury to reconsider their verdict is not conditioned on the verdict being so unreasonable that, if accepted, it would have to be set aside." (Citations omitted; footnote in original; internal quotation marks omitted.) *Van Nesse* v. *Tomaszewski*, 265 Conn. 627, 634, 829 A.2d 836 (2003).

Nothing in the record indicates that the jury disregarded the law or the court's reinstruction on comparative negligence. The inconsistencies in the first verdict wherein the jury found the plaintiffs to be 70 percent negligent but nonetheless found in favor of the plaintiffs and awarded them damages indicates confusion. However, following reinstruction on comparative negligence, the second verdict was consistent with the jury finding the defendant 100 percent negligent, finding in favor of the plaintiffs, and awarding them damages. Jurors sometimes can be mistaken or confused at first but that does not mean that they are disregarding or violating the law or the court's instructions when they change their mind following reinstruction by the court. Contra *Labatt* v. *Grunewald*, supra, 182 Conn. 241 (it was clear

---

[9] "General Statutes § 52-223 provides: The court may, if it judges the jury has mistaken the evidence in the action and has brought in a verdict contrary to the evidence, or has brought in a verdict contrary to the direction of the court in a matter of law, return them to a second consideration, and for the same reason may return them to a third consideration. The jury shall not be returned for further consideration after a third consideration." (Internal quotation marks omitted.) *Van Nesse* v. *Tomaszewski*, 265 Conn. 627, 634 n.5, 829 A.2d 836 (2003).

that jury was confused when verdict that was returned was illogical and unreasonable in light of instructions given in case where, even after additional charge on comparative negligence, jury informed judge that they were confused).

In the absence of a contrary indication in the present case, the jury is presumed to have followed the court's instructions. See *Duncan* v. *Mill Management Co. of Greenwich, Inc.*, 308 Conn. 1, 22, 60 A.3d 222 (2013). Second, a jury is allowed to change its mind. Simply put, a jury is not bound either as to the amount of the damage award or as to the liability findings from its first verdict and can reconsider the verdict. "[U]ntil the jury rendered a verdict that the court accepted, the jury was free to change its award regarding the award of noneconomic damages." *Van Nesse* v. *Tomaszewski*, supra, 265 Conn. 635; see also *Towhill* v. *Kane,* 147 Conn. 191, 194, 158 A.2d 251 (1960) (no merit to claim that jury, upon reconsideration, was powerless to change verdicts on issue of liability). Additionally, there was no request for the jury to be returned to reconsider its verdict for a third time because of jury confusion.

Accordingly, the court did not abuse its discretion in accepting the second verdict and properly denied the defendant's motion to set aside the verdict. See, e.g., *Van Nesse* v. *Tomaszewski*, supra, 265 Conn. 634–35 (where court returned case to jury with instructions to reconsider amount of economic damages as it was contrary to stipulation, jury was free to increase its award of noneconomic damages so as to award same total award as original verdict because implicit in notion that trial court has discretion to decline to accept jury's verdict is that until verdict is accepted, there is no valid verdict).

IV

The defendant last claims that the court improperly declined to charge the jury on spoliation of the evidence concerning a missing letter from Tebbets' file because the issue of whether it was disposed of intentionally or

inadvertently was within the province of the jury. We are not persuaded.

"In determining whether the trial court improperly refused to give a requested charge, we review the evidence presented at trial in the light most favorable to supporting the proposed charge. . . . A request to charge which is relevant to the issues of [a] case and which is an accurate statement of the law must be given. . . . If, however, the evidence would not reasonably support a finding of the particular issue, the trial court has a duty not to submit it to the jury. . . . Thus, a trial court should instruct the jury in accordance with a party's request to charge [only] if the proposed instructions are reasonably supported by the evidence." (Citation omitted; internal quotation marks omitted.) *National Publishing Co.* v. *Hartford Fire Ins. Co.*, supra, 287 Conn. 671.

An adverse inference may be drawn against a party who destroyed evidence only if the trier of fact is satisfied that the party who seeks the adverse inference has proven the following. First, the spoliation must have been intentional, meaning that the evidence was disposed of intentionally and not merely destroyed inadvertently; second, the destroyed evidence must be relevant to the issue or matter for which the party seeks the inference; and third, the party who seeks the inference must have acted with due diligence with respect to the spoliated evidence. *Beers* v. *Bayliner Marine Corp.*, 236 Conn. 769, 777–78, 675 A.2d 829 (1996).

On direct examination, Tebbets testified that he made an inspection in the present case as a result of either an email or a phone call. When asked "what happened to that email," he explained that, "unfortunately, I did this inspection in 2016 and my daughter, who maintains my files, thought that a case six—this was back, what, six or seven months ago, a case that is six years old had already settled, and inadvertently disposed of it. So, I lost my paper file on that case, but I did have the things that were left on my computer." On cross-examination, he explained again that his "daughter had inadvertently

thrown out the file." When asked, "So, there was a data dump off your computer of one document from one file," Tebbets responded, "No, it wasn't a data dump. It was [a] paper file that she looked at it and thought that it was all over and done with." He further explained that "[t]he remainder of the file was kept on my—on my computer."

At the charging conference, the defendant's counsel requested that the jury be charged on the spoliation of evidence concerning the letter missing from Tebbets' file, arguing that "the evidence presented shows that the destruction of that file was intentional. [Tebbets] testified that his daughter, who works for him, destroyed the file at his direction, so that would be an intentional act, not inadvertent." In declining to charge the jury on spoliation, the court reasoned, "[w]ith respect to spoliation, the court did consider this charge in relation to [Tebbets], but the court did not see any evidence presented that [Tebbets] destroyed the letter . . . intentionally. It's— the evidence presented was, at most, negligent, and, therefore, the court has declined to give that charge."

The court's reasoning for not charging the jury on spoliation rested on the fact that no evidence was presented at trial that Tebbets intentionally had the file containing the letter destroyed. It is well established that it is error for a court to instruct the jury on an issue that is not supported by the evidence offered at trial and, instead, jury instructions should be confined to matters in issue by virtue of the pleadings and evidence in the case. See *Kos* v. *Lawrence + Memorial Hospital*, 334 Conn. 823, 838, 225 A.3d 261 (2020). Our review of the record reveals that the only evidence adduced at trial concerning the missing letter was from Tebbets, who testified that his daughter inadvertently disposed of his paper file and that his electronic version of the file did not contain the missing letter. Although the trier of fact may either believe or disbelieve Tebbets, it could not presume from his testimony that his daughter inadvertently disposed of the file that the opposite was true. See *Novak* v. *Anderson*, 178 Conn. 506, 508, 423 A.2d 147

**(1979)** (**"**While it is true that it is within the province of the jury to accept or reject a defendant's testimony, a jury in rejecting such testimony cannot conclude that the opposite is true. . . . A jury cannot, from a disbelief of a defendant's testimony, infer that a plaintiff's allegation is correct." (Citations omitted.**)**). Accordingly, the court did not improperly determine that there was no evidence that the letter was disposed of intentionally.

Although the defendant primarily focuses on the first prong of the spoliation test, it also states that the other prongs of a spoliation claim "are not in question." We disagree. Scant evidence was produced at trial as to the second prong of relevance. On cross-examination, Tebbets answered the following question in the affirmative: "[J]ust so we're clear, the correspondence or email that you assume retained you, directed you, and asked you what to do from this file is missing. That's correct?" Although Tebbets testified that the plaintiffs hired him in the present case, there was no record evidence as to who sent him the letter. Additionally, when he was then asked, "[t]hat's a pretty pivotal part of the file, wouldn't you agree," Tebbets responded, "[n]ot really, because we have the report to show what I was asked to look at. So, everything—the only thing I don't have is the piece of paper asking me to do what I did. And obviously I got paid for it, so I must've done what I was asked to do. So, if you put those two bookends together, I think there is really no need for an email asking me to go out there because I did." Given this testimony, it is questionable how relevant the letter sent to Tebbets could be to the premises liability action where the only evidence of the content of that letter was that it merely instructed Tebbets to investigate the Liberty Bank parking lot and it is not even clear who sent the letter.

The third prong requires the party seeking the inference to have acted with due diligence with respect to the spoliated evidence. "If the spoliated evidence was necessary for inspection or testing, the party who seeks the inference must have taken all appropriate means to

have the evidence produced." *Beers* v. *Bayliner Marine Corp.*, supra, 236 Conn. 778. On July 5, 2018, before the letter was inadvertently destroyed, the plaintiffs disclosed Tebbets as an expert witness, yet the defendant did not depose Tebbets until more than four years later on September 14, 2022.

The defendant emphasizes in its brief that the issue of spoliation and, in particular, whether the file was disposed of inadvertently or intentionally, was a factual issue for the jury to decide. While a relevant charge must be given if, inter alia, it is reasonably supported by the evidence; see *National Publishing Co.* v. *Hartford Fire Ins. Co.*, supra, 287 Conn. 671; the converse is also true. "It is well established that it is error [for a court] to instruct the jury on a doctrine or issue [that is] not supported by the evidence offered at trial."[10] *Kos* v. *Lawrence + Memorial Hospital*, supra, 334 Conn. 838.

Even in the light most favorable to supporting the charge, there is scant evidence in the record concerning the second and third prongs, and what little evidence there is does not support those elements. More significantly, evidence as to the first prong did not support it. Accordingly, the court acted properly in failing to instruct the jury on spoliation. See id.

In sum, we reject the defendant's claims on appeal because we conclude that **(1)** there was sufficient evidence from which the jury reasonably could have found that Hope fell at the spot in a parking lot containing an uneven depressed linear defect of which the defendant

---

[10] In addition to not demonstrating error, the defendant made no argument on appeal concerning harmfulness. Even if, for the sake of argument, we assumed error, the defendant would not be entitled to a new trial because the defendant has not fulfilled its burden of demonstrating that any error was harmful. See *Kos* v. *Lawrence + Memorial Hospital*, supra, 334 Conn. 845. An instructional impropriety is harmful if it is likely that it affected the verdict. Id. The letter directing Tebbets to conduct an investigation of the parking lot was not material and, therefore, was unlikely to have affected the verdict. Tebbets' electronic file was intact in all other respects, and he testified to his observations of the parking lot at trial.

had at least constructive notice; **(2)** the court properly rejected the defendant's requested charge limiting use of Hope's statements under §52-172 to only his case; **(3)** the court properly exercised its discretion in accepting the jury's second verdict; and **(4)** the court did not improperly decline to charge the jury on spoliation of the evidence.

The judgment is affirmed.

In this opinion the other judges concurred.